No. 107,906

STATE OF KANSAS, *Appellee*, v. DOMINIC VERSER, *Appellant*.
(326 P.3d 1046)

Opinion filed June 6, 2014.

*Rick Kittel*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jennifer S. Tatum*, assistant district attorney, argued the cause, and *Michael C. Duma*, assistant district attorney, *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: A jury convicted Dominic Verser of first-degree murder and criminal possession of a firearm in the March 2009 shooting death of Olivia Anaekwe, the mother of his child. On this appeal, Verser raises four issues: (1) failure to grant a mistrial; (2) failure to apply K.S.A. 2013 Supp. 60-455 to evidence of a previous dispute between Verser and Anaekwe; (3) error in a jury instruction on reasonable doubt; and (4) error in responding to a jury question. None of these challenges requires reversal of Verser's convictions or sentences.

### FACTUAL AND PROCEDURAL BACKGROUND

Verser and Anaekwe began dating in late 2007 or early 2008. Anaekwe eventually became pregnant, and she and Verser began living together. In August 2008, Verser moved out. Verser moved in with his mother, Claudette Barker, who lived in one side of a conventional duplex, which shared a driveway with the duplex' other unit. According to Anaekwe's sister, Angel Sallis, Anaekwe would "constantly" visit Verser's home and the two continued to have an "off and on" relationship. In February 2009, Anaekwe gave birth to their daughter.

The problems between Verser and Anaekwe continued after the baby's birth. In the early morning hours of March 3, 2009, Anaekwe called 911 after Verser "kicked her out" of his home but kept their baby inside. When an officer arrived in response to the call, Anaekwe was waiting in her car. Anaekwe and the officer then went and knocked on the door of Verser's home and asked for the baby. Claudette answered the door and gave the baby to Anaekwe and the officer. Verser had left the home before police arrived.

On the afternoon of March 26, 2009, Anaekwe drove her brother, Richard, to work. Richard would later testify that Anaekwe told him during the car trip that she intended to "move away from Kansas" to "get away from it all" and to get away from Verser. After dropping Richard off, Anaekwe went to Verser's home to give Verser's sister, Chrishawn Barker, a ride to a bank.

When Anaekwe and Chrishawn returned from the bank, Verser was at the duplex. Anaekwe had overheard Chrishawn and Verser

discussing whether he would go to Michigan with Chrishawn. But at about 4 p.m., on the front porch of the duplex, Verser told both women that, because of the baby, he would not be going to Michigan. Chrishawn then went inside and slept until approximately 9 p.m.

When Chrishawn woke up, she spent a short time at a house next door to the duplex, where her cousin, Anthony Barker, lived; Anthony was having a party. When she returned from the party, she saw Anaekwe, Verser, and the baby in the backseat of Anaekwe's car, which was parked in the driveway of the duplex. Chrishawn went back into the duplex and again fell asleep.

Sometime between 10 p.m. and 10:30 p.m., Steven Ward, who lived in the second unit of the duplex where Verser lived, heard a commotion outside. He believed the commotion—caused by two people, one of whom was a woman—lasted between 8 and 10 minutes and ended "[l]oud and fast" with "[a] loud thud, boom." After about 10 minutes of quiet, the police and fire departments responded to the scene.

Ward's wife, Joyce, was in another room of the Wards' side of the duplex during the commotion. She heard what sounded like a car "quickly" leaving the shared driveway between 9 p.m. and 10 p.m. A few minutes later, she heard a woman scream. To Joyce, the scream sounded like the woman was "scared like something was wrong."

A third neighbor reported that he heard what he believed to be a gunshot at approximately 10:45 p.m.

A 911 dispatcher received a call from Verser's residence at 10:41 p.m. Although Claudette would initially say that she placed the call after hearing what sounded like "firecrackers," she eventually conceded that she made the call after Verser came inside and said Anaekwe had been shot. During the 911 call, Claudette gave the phone to Chrishawn. Chrishawn had just awakened, and, when she took the phone, her mother told her to tell the 911 operator that they had "heard gunshots."

Antonio Barker, Verser's brother who lived with Verser, said Verser had come into the duplex and admitted shooting Anaekwe.

Kevin Barker, a cousin who lived with Verser, also saw him after the shooting. Kevin was at Anthony's house next door when he and Anthony heard what sounded like a woman yelling. A short time later, Verser's mother arrived and handed Kevin a heavy object wrapped in a white t-shirt. According to Kevin, the object "felt like a firearm," and he hid it under a mattress in Anthony's bedroom.

When Verser arrived at Anthony's house a short time later, Kevin said, Verser had blood on his bottom lip. Verser went into a downstairs bathroom for a moment, and while he was in there, he looked in the mirror "like . . . he was looking to see what . . . was on his face." He also made a telephone call to an unidentified person. Kevin did not see Verser again between the night of the murder and Verser's trial.

After the 911 call, Chrishawn saw the baby lying on a couch in Verser's home and took her across the street to wait at a relative's house for the police. Chrishawn did not know how the baby had gotten inside the duplex and onto the couch. Although Chrishawn tried to get her mother to come across the street with her and the baby, her mother did not follow.

When firefighters arrived on the scene, they found Anaekwe's car stopped in the street with its driver's door open and a body lying partly in the street and partly in the car. There was no pulse detectible, and, based on that and the nature of the injuries, it was apparent that the person, later identified as Anaekwe, was dead.

According to an autopsy conducted the next day, Anaekwe had suffered a "perforating gunshot wound" to the right side of the top of her head. The coroner concluded that a high-powered round was fired from a gun at least 24 inches away. The State's bloodstain-pattern analyst concluded that the front driver's side and passenger doors were closed when the shot was fired, and a spent cartridge was found beneath Anaekwe's body. The cartridge's location, in addition to the pattern of the bloodstains, demonstrated that Anaekwe had been shot from the direction of the backseat and that the gun was inside the car when fired. The bloodstain-pattern analyst could not determine whether the person holding the gun also was inside the car when the shot was fired.

The gun used in the murder was never found, but the casing showed that the gun fired a .223 cartridge. A search of Verser's residence produced a live .223 REM cartridge in a dresser and a manual for a Kel-Tec PLR-16 pistol, which fires a .223 round. A firearms expert also was able to conclude from the casing that the murder weapon was likely to have been a Kel-Tec PLR-16 or a Kel-Tec SU-16 rifle, each of which employs a specific bolt mechanism; but the expert could not definitively rule out other guns.

Verser was immediately a suspect in the shooting, but police did not locate him until approximately 6 months later. Operating on a tip, Kansas City, Missouri, police officers found Verser in a park. Although Verser ran when the officers attempted to speak to him, he was caught after a short chase. Upon arrest, Verser gave a false name.

Before his trial, Verser filed a motion in limine to prevent the State from presenting testimony about any prior crimes or civil wrongs controlled by K.S.A. 2013 Supp. 60-455. Verser was primarily concerned about the March 3 incident, in which Anaekwe had to summon police to get the baby from inside Verser's residence. At a pretrial hearing on the motion, the district judge intimated that the evidence would not come within the purview of K.S.A. 2013 Supp. 60-455, but he did explicitly rule on the admissibility question. At trial, when Verser objected to testimony about Anaekwe's 911 call, the district judge allowed the evidence, apparently reasoning that the evidence did not fall under K.S.A. 2013 Supp. 60-455.

The most controversial testimony at Verser's trial came from Michael Cox, another neighbor. The State became aware of Cox only a few weeks before trial, after Anaekwe's mother found him. Cox met with detectives for the first time a week before trial began. Then, at trial, during his direct examination, Cox testified that he heard "firecrackers" at approximately 10:50 p.m. on the night of Anaekwe's murder. The noise prompted Cox to look outside, where he saw a car sitting in the street with its driver's side door open. A man that Cox was "45%" sure was Verser was standing next to the car. Cox said that he observed a gun in the man's hand and that

he saw the man take a baby out of the backseat. Cox testified that the man then ran away from the car and up the street.

Defense counsel's cross-examination of Cox entirely neutralized Cox's value to the State's case. Cox had testified on direct that he arrived home about 10:35 p.m., but he was forced to admit on cross that he had not left work until 11:10 p.m. and did not arrive home until approximately 11:50 p.m.—well after the murder. Defense counsel also asked Cox about a statement he had given to detectives about seeing the victim "hunched over to the right in the car." Cox admitted he had not actually seen any such thing. Cox also had told investigators and had testified on direct that he left his house after the murder, which explained why he was not around to provide a statement during the initial investigation. The cross-examination then concluded with the following exchange:

"Q. Are you sure you remember what you're testifying that you remember or do you think you remember what you're testifying?
"A. I think.
"Q. So you're not sure you witnessed what you're saying you witnessed, are you?
"A. No, sir. So I have problems remembering stuff.
"Q. So everything that you've been testifying to, you're not sure if that's the truth or not, are you?
"A. No, sir."

Things did not improve for the State during Cox's redirect examination:

"Q. So, Mr. Cox, you're saying everything you just said didn't happen, is that true?
"A. Yes.
. . . .
"Q. Okay. So you lied just now the whole time?
"A. Sorry.
. . . .
"Q. . . . Well, do you remember this or not?
"A. No.
. . . .
"Q. Did you ever remember this then?
"A. No.
"Q. Then why did you come forward and say you did?
"A. I don't know."

The State moved to strike Cox's testimony from the record. During a bench conference on the State's motion, defense counsel sought a mistrial. Before the State had an opportunity to respond fully, the district judge ordered a short recess so that defense counsel could discuss the situation with Verser.

When the proceedings resumed, defense counsel withdrew his motion for mistrial. The State then sought a mistrial, and the district judge ordered another recess.

On return to the courtroom, the district judge said that he was inclined to grant a mistrial if Verser wanted one. The district judge also advised Verser that he could not challenge the judge's failure to grant a mistrial on appeal, if he refused to be given one. Verser and his counsel had a brief discussion, and then counsel informed the court that Verser wanted to proceed with the trial. The judge denied the State's motion for mistrial.

At the conclusion of evidence, the district judge explained to the jury how to consider Cox's testimony:

"[I]f you recall early on in the case, there was a witness named Michael Cox who testified. At the conclusion of his testimony, Ms. Tatum on behalf of the State asked that his testimony be stricken from the record. I have denied that motion. You are the finders of facts, ladies and gentlemen. You can give each witness whatever weight you think that testimony deserves."

During closing arguments, both parties reminded the jurors that Cox had lied on the stand and that they should not rely on his testimony in determining Verser's guilt.

Before deliberations began, the district judge provided an instruction on reasonable doubt. The written instruction read in pertinent part:

"The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of *each* of the claims required to be proved by the State, you should find the defendant guilty." (Emphasis added.)

When the district judge read the reasonable doubt instruction aloud to the jury, however, he misspoke:

"The test [you] must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims

required to be proved by the State, you must find the defendant not guilty; if you have no reasonable doubt as to the truth of *any* of the claims required to be proved by the State, you should find the defendant guilty." (Emphasis added.)

During deliberations, the jury sent the following question out to the district judge:

"We want to see the statements from the following witnesses given to the police: Chrishawn Barker, Claudette Barker, Steven Ward, Joyce Ward.

"[A]re the tape recordings available to us? If so, can we listen to them?"

The district judge gathered the parties and counsel, including Verser, to discuss an appropriate response. Both sides agreed with the district judge's suggestion:

"The written statements to police of: Chrishawn Barker, Claudette Barker, Steven Ward and Joyce Ward were not admitted into evidence.

"The tape recordings of these statements were not admitted into evidence."

The State asked whether jurors should be brought back into the courtroom to have the answer to their question read aloud to them, launching the following exchange:

"[VERSER'S COUNSEL]: Judge, I've never had that situation before in all the jury trials I've had in any jurisdiction. I've never had the answer read to a jury in front of the defendant, at least a question.

"THE COURT: You're not requesting that I—

"[VERSER'S COUNSEL]: I'm not requesting it.

"[THE STATE]: I'm comfortable then.

"[VERSER'S COUNSEL]: The answer is appropriate. I've talked to my client about it.

"THE COURT: Well, the reason I follow the procedure I do is that the defendant's present in the courtroom, the question is read, the answer is read so the defendant knows precisely what is going on.

"[THE STATE]: Okay. I'm comfortable if he's not asking they be brought in.

"[VERSER'S COUNSEL]: I'm fine.

"THE COURT: Okay."

The court's response was then sent to the jury.

Verser was convicted on both counts. He was sentenced to a hard 25 life sentence on the first-degree murder charge and to 12 months' imprisonment for the criminal possession of a firearm charge. The sentences were ordered to run consecutively.

Discussion

*Testimony of Michael Cox*

Verser's first argument on appeal is that Cox's admission that his testimony was fabricated constituted a fundamental failure of the proceedings necessitating declaration of a mistrial. Because the district judge gave Verser the option of having a mistrial declared, and Verser deliberately chose to continue the trial, we hold that error, if any, was invited.

In general, when a defendant has invited error, he or she cannot complain of the error on appeal. *State v. Peppers*, 294 Kan. 377, 393, 276 P.3d 148 (2012). Verser argues that the general rule should be inapplicable here because Cox's perjury violated his right to a fair trial and was structural error.

It is true that the invited error doctrine is inapplicable when a constitutional error is structural. See *State v. Hill*, 271 Kan. 929, 934, 26 P.3d 1267 (2001) (structural errors so intrinsically harmful, automatic reversal required without regard to existence of effect on outcome), *abrogated on other grounds by State v. Voyles*, 284 Kan. 239, 252-53, 160 P.3d 794 (2007). But not all constitutional errors qualify for the "structural" label. In fact, few do. See *United States v. Marcus*, 560 U.S. 258, 263, 130 S. Ct. 2159, 176 L. Ed. 2d 1012 (2010) (short list of structural errors includes total deprivation of counsel, lack of impartial trial judge, denial of right to self-representation at trial, violation of right to public trial, erroneous reasonable doubt instruction).

When addressing the application of the invited error doctrine to constitutionally deficient jury instructions, a panel of our Court of Appeals has distinguished between error arising from an inadvertent mistake and error arising from a defense trial strategy. See *State v. Hargrove*, 48 Kan. App. 2d 522, 547, 293 P.3d 787 (2013). The distinction is useful here, where there can be no question that the decision to continue the trial was part of Verser's trial strategy.

After Cox's fabrication was exposed, the district judge, the prosecutor, and Verser's counsel carefully considered whether a mistrial was appropriate. Verser consulted with his counsel to determine which course of action they wished to pursue. Essentially,

the district judge left the decision whether a mistrial would be granted up to the defense. And he warned Verser before Verser and his counsel made their choice that the decision was likely to have consequences on appeal—specifically, Verser would not be able to challenge the judge's failure to grant a mistrial because of Cox's testimony.

In this case, cross-examination worked precisely as all defense counsel hope it will work. It revealed one of the State's witnesses as someone unwilling or unable to tell the truth. See *Crawford v. Washington*, 541 U.S. 36, 74, 124 S. Ct. 1354, 158. L. Ed. 2d 177 (2004) (Rehnquist, C.J., concurring) ("Indeed, cross-examination is a tool used to flesh out the truth, not an empty procedure."); *Maryland v. Craig*, 497 U.S. 836, 845, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."); *California v. Green*, 399 U.S. 149, 158, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970) ("cross-examination, the 'greatest legal engine ever invented for the discovery of truth' "). Verser's decision to proceed did not result in an unavoidable miscarriage of justice; it enabled Verser and his counsel in their intentional effort to undermine the State's otherwise convincing case. We are doubtful that denial of the State's motion for mistrial was error at all. But, if it was, it was not only invited; it was welcomed by the defense; and it is not reversible.

*K.S.A. 2013 Supp. 60-455 Evidence*

Verser argues that the district judge committed reversible error when he admitted evidence of the incident between Verser and Anaekwe that occurred approximately 3 weeks before her murder.

Generally, in cases not involving sex crimes, a district judge applies a three-part test to determine whether to admit evidence of a defendant's prior crimes or civil wrongs under K.S.A. 2013 Supp. 60-455; and our standard of review varies, depending which step of the test is in question. See *State v. Dean*, 298 Kan. 1023, 1032-33, 324 P.3d 1023 (2014); *State v. Torres*, 294 Kan. 135, 139-40, 273 P.3d 729 (2012). But here the district judge did not engage in a

K.S.A. 2013 Supp. 60-455 analysis at all. Rather, he appears to have ruled that the evidence was not subject to a K.S.A. 2013 Supp. 60-455 challenge, because Verser's earlier behavior in keeping his daughter inside his residence when he kicked Anaekwe out was not a crime or civil wrong.

Even if we assume that the district judge committed error in failing to analyze the evidence under K.S.A. 2013 Supp. 60-455, we ultimately conclude that any such error was harmless.

Violations of K.S.A. 2013 Supp. 60-455 are subject to the non-constitutional harmlessness standard of K.S.A. 2013 Supp. 60-261. See *State v. Preston*, 294 Kan. 27, 35-36, 272 P.3d 1275 (2012). Under that standard, the party benefitting from the error has the burden of showing that "there is no reasonable probability the error affected the trial's outcome in light of the entire record." *State v. McCullough*, 293 Kan. 970, Syl. ¶ 9, 270 P.3d 1142 (2012).

The evidence against Verser on the two charges in this case was overwhelming. Shortly before the shooting, he was seen in the backseat of Anaekwe's car with her and their baby. Neighbors heard what sounded like an argument between two persons, one female, that ended with a car driving away "[l]oud and fast." According to Verser's mother, Verser came into the duplex and told her to call 911 because Anaekwe had been shot. Verser's brother testified that he heard Verser admit to doing the shooting. After placing the 911 call, Verser's mother went next door and gave Kevin a heavy object wrapped in a white t-shirt, which, according to Kevin, "felt like a firearm." A gun manual and live round found in Verser's bedroom matched the type of gun that ballistics tests indicated was used in the shooting. Before he fled, Verser was seen with blood on his face. Based on this evidence, we hold that the State has carried its burden to establish that there is no reasonable probability any K.S.A. 2013 Supp. 60-455 error affected the outcome of Verser's trial.

*Reasonable Doubt Instruction*

The reasonable doubt instruction read aloud to Verser's jury differed from the one given to the jury in writing by one word. The oral instruction said: "[I]f you have no reasonable doubt as to the

truth of *any* of the claims required to be proved by the State, you should find the defendant guilty." The written instruction used the preferred "each" in place of the "any."

"[O]rally instructing the jury on applicable law is one of a trial court's fundamental duties." *Miller v. State*, 298 Kan. 921, 933, 318 P.3d 155 (2014). Although the district judge's oral instruction here differed from his written instruction, we are not persuaded that reversal is required. We have previously affirmed convictions when an instruction such as the one read aloud in this case was given to a jury. See *State v. Todd*, 299 Kan. 263, 273, 323 P.3d 829 (2014); *State v. Waggoner*, 297 Kan. 94, 98-99, 298 P.3d 333 (2013); *State v. Smyser*, 297 Kan. 199, 205-06, 299 P.3d 309 (2013); *State v. Herbel*, 296 Kan. 1101, 1124, 299 P.3d 292 (2013). We are not inclined to depart from that precedent now, particularly in a case in which the preferred language appeared in the written instruction sent into the deliberations room with the jury.

*Response to Jury Question*

Verser's final appellate challenge focuses on the procedure used by the district judge to answer the jury's question. Verser insists that the judge should have read the answer aloud to the jury in open court, with him and his counsel present, to avoid violating Verser's right to be present at every critical stage of the proceeding, his right to a public trial, and his right to an impartial judge.

Appellate arguments on a defendant's right to be present at every critical stage of his or her criminal trial raise an issue of law over which this court exercises unlimited review. *Herbel*, 296 Kan. at 1106-07.

K.S.A. 22-3420(3) governs a trial court's procedures for answering questions from a jury once it has begun deliberating.

"After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they may request the officer to conduct them to the court, where the information on the point of the law shall be given, or the evidence shall be read or exhibited to them in the presence of the defendant, unless he voluntarily absents himself, and his counsel and after notice to the prosecuting attorney." K.S.A. 22-3420(3).

Our caselaw echoes this statute's requirement. "[A]ny question from the jury concerning the law or evidence pertaining to the case

must be answered in open court in the defendant's presence unless the defendant is voluntarily absent." *State v. King*, 297 Kan. 955, 967, 305 P.3d 641 (2013) (citing *State v. Coyote*, 268 Kan. 726, 732, 1 P.3d 836 [2000]). And any act or omission violating K.S.A. 22-3420(3) also violates K.S.A. 22-3405(1) ("The defendant in a felony case shall be present . . . at every stage of the trial . . . except as otherwise provided by law."), and the "guarantee of the Sixth Amendment to the United States Constitution that a criminal defendant may be present at every critical stage of his or her trial." *King*, 297 Kan. at 968.

Moreover, a criminal defendant's statutory and constitutional rights to be present are personal to him or her; they generally cannot be waived through counsel, unless the defendant and counsel have previously discussed the matter and agreed upon the waiver. Compare *State v. Lopez*, 271 Kan. 119, 132, 22 P.3d 1040 (2001) (waiver ineffective when counsel purported to waive defendant's right without discussion), with *State v. Sandstrom*, 225 Kan. 717, 722, 595 P.2d 324 (waiver effective when undisputed that defendant, through counsel, waived right to be present at hearings), *cert. denied* 444 U.S. 942 (1979). See also *State v. Larraco*, 32 Kan. App. 2d 996, 1001, 93 P.3d 725 (2004) ("While an attorney may make representations to the court which bind the client, defense counsel can only waive the rights of clients as long as those rights are not inherently personal, fundamental rights."). The personal nature of the defendant's statutory and constitutional rights to be present at all critical stages means that they cannot be waived by counsel's mere failure to object.

The State argues that Verser himself waived his right to be present when the answer to the jury's question was delivered. But the record on appeal does not support the State's position.

Verser was present for the judge's and parties' formulation of the content of the answer, but he did not personally agree to the method of delivery. When the district judge received the question, counsel and Verser gathered in the courtroom to discuss an appropriate answer. After all agreed on the answer's content, the State raised a question about whether the jury should be brought in to have the answer read in open court. Verser's counsel stated,

"I've never had that situation before in all the jury trials I've had in any jurisdiction," and said he was "not requesting [the jury be brought in]." Further, he expressly approved the answer and said he had talked to Verser about it. At that point, the prosecutor said she was "comfortable" with responding in writing if Verser's counsel was not asking that the jury be brought in. Verser's counsel responded: "I'm fine." Defense counsel said nothing about whether he had discussed the procedure with his client or whether Verser also was "fine" with it. His suggestion that the proposed procedure was common practice in the jurisdictions with which he was familiar makes it unlikely he would have believed consultation with his client and a defendant's personal waiver of the right to be present were necessary.

Having concluded the record does not support the existence of a personal waiver by Verser, we are compelled to hold that it was both statutory and constitutional error to fail to read the answer to the jury's question in open court with Verser present. See *King*, 297 Kan. at 967-68. The State, however, insists that any error was harmless.

When violations of both statutory and federal constitutional rights arise from the same acts or omissions, we apply only the more rigorous of the two harmless error standards—the federal constitutional harmless error standard. *King*, 297 Kan. at 968; see also *State v. Brown*, 298 Kan. 1040, 1051, 318 P.3d 1005 (2014) (prosecutorial misconduct). Under the federal standard, "error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

Four factors assist our evaluation of whether a district judge's communication with the jury outside the presence of the defendant is harmless under the constitutional standard:

"(1) the overall strength of the prosecution's case; (2) whether an objection was lodged; (3) whether the ex parte communication concerned a critical aspect of the trial or rather involved an innocuous and insignificant matter, and the manner

in which it was conveyed to the jury; and (4) the ability of a posttrial remedy to mitigate the constitutional error." *Herbel*, 296 Kan. at 1111 (citing *State v. McGinnes*, 266 Kan. 121, 132, 967 P.2d 763 [1998]).

On the first factor, we have already observed that the State's case against Verser was strong. Anaekwe was shot with a gun consistent with the gun manual recovered from Verser's bedroom. Verser's mother, brother, and sister all gave testimony that clearly implicated Verser in the crime—including Verser's opportunity, his access to a gun, and his admission. Verser's disappearance for 6 months after the murder and his brief on-foot flight when approached by law enforcement tended to show his consciousness of his guilt.

On the second factor, there was no objection.

On the third factor, the information conveyed to the jury in answer to its question qualified as innocuous and insignificant. The jury asked to see the statements made by several witnesses to police and, if possible, to hear any recordings of those statements. The requested material had not been admitted into evidence, and the jury was simply informed of this fact. The answer was not substantive at all.

The final factor asks whether a posttrial remedy could mitigate the constitutional error. See *Herbel*, 296 Kan. at 1115 (defense unaware of ground for objection). It is clear from the record that both Verser and his counsel were well aware of the procedure used to deliver the answer to the jury's question, and they did not choose to express opposition to it at the time. Without any objection or posttrial motion before the district court, the only remedy still available is reversal.

The four factors lead us to conclude that there is no reasonable possibility the district judge's failure to read the answer to the jury's question in open court in Verser's presence contributed to the guilty verdicts. The information delivered was not substantive; it added nothing to and subtracted nothing from the evidence before the jury. Reversal is unwarranted when the information communicated outside the defendant's presence is so vanilla.

Verser also argues that the jury-answer procedure used here violated his rights to a public trial and to an impartial judge. In

contrast to the defendant's right to be present, which we have addressed on multiple occasions, whether the jury-answer procedure used here implicates Verser's rights to public trial and impartial judge have not frequently been addressed. Verser cites law supporting the existence of such rights in the abstract and law supporting reversal for violation, but he fails to explain how the procedure followed here qualifies for such treatment. See *State v. Garza*, 290 Kan. 1021, 1034, 236 P.3d 501 [2010] ["Issues raised in passing that are not supported by argument or cited authority are deemed waived."]); *State v. Gibson*, 299 Kan. 207, 322 P.3d 389 (2014) (citing *State v. Torres*, 280 Kan. 309, 331, 121 P.3d 429 [2005] [simply pressing point without pertinent authority or without showing why it is sound despite lack of supporting authority or in the face of contrary authority akin to failing to brief point; issue deemed waived or abandoned]. We therefore consider these arguments waived or abandoned and do not reach their merits. See *State v. Bowen*, 299 Kan. 339, 323 P.3d 853 (2014) (public trial and impartial judge arguments deemed abandoned for failure to adequately brief).

## CONCLUSION

Defendant Dominic Verser's convictions and sentences for first-degree murder and criminal possession of a firearm are affirmed.