No. 110,718

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TRAVIS M. KNIGHTEN,
*Appellant*.

SYLLABUS BY THE COURT

1.

District courts use a three-step analysis to resolve challenges based on *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). First, the court must determine whether the defendant has made a prima facie showing that the prosecutor exercised peremptory challenges on the basis of race. If so, the burden shifts to the prosecutor to give race-neutral reasons for striking the prospective jurors at issue. At this point, the burden shifts back to the defendant for purposes of proving purposeful discrimination.

2.

To establish a prima facie case of intentional racial discrimination as required in the first step of the analysis in *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the defendant must show that the prosecutor has exercised peremptory challenges to remove venire members from the jury and that this fact, along with any other relevant circumstances, raises an inference that the government used the peremptory challenges to exclude members of the venire panel on account of their race. Upon a prima facie showing, the burden shifts to the government to come forward with a racially neutral explanation for its peremptory challenges. If the government comes

1

forward with a racially neutral explanation, the district judge then must decide the ultimate question of whether the defendant carried his or her burden of proving purposeful discrimination. While a *Batson* claim involves a three-step process, the burden of persuasion always remains with the party opposing a peremptory challenge.

3.

The preliminary issue of whether the defendant has made a prima facie showing that the State used peremptory challenges on the basis of race becomes moot if the trial court goes on to rule on the ultimate question of discrimination.

4.

The burden to provide race-neutral reasons for striking prospective jurors is only one of production, not persuasion, and, unless a discriminatory intent is inherent in the answer, the offered reason will be deemed race-neutral.

5.

In order to determine whether the reasons offered by the State for striking certain jurors revealed an inherently discriminatory intent or whether the offered reason should be deemed race-neutral, the court must necessarily have before it some reason why the State decided to strike the jurors.

6.

The personal nature of a defendant's statutory and constitutional rights to be present at all critical stages of a trial means that they cannot be waived by counsel's mere failure to object.

7.

The trial court is statutorily required to respond to all questions from a deliberating jury in open court or in writing, and the defendant is required to be present during any response if given in open court, unless such presence is waived.

8.

Under the federal constitutional harmless error test, an error is only harmless where the party benefitting from the error persuades the court beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict.

9.

The defendant in a criminal case has a statutory and constitutional right to be present during the discussion of any written questions presented by the jury, unless the defendant has waived his or her presence. A lack of evidence in the record establishing a defendant's presence or his or her waiver requires appellate courts to presume that the defendant's rights were violated.

10.

The trial court is statutorily required to instruct the jury on lesser included offenses where there is some evidence that would reasonably justify a conviction of the lesser included offense.

11.

Voluntary manslaughter is knowingly killing a human being committed upon a sudden quarrel or heat of passion.

12.

In order to prove voluntary manslaughter, there must have been legally adequate provocation. Provocation can be a legal defense to a charge of voluntary manslaughter if such provocation is shown to have been calculated to deprive a reasonable person of self-control and to cause the defendant to act out of passion rather than reason. Mere words or gestures, however insulting, do not constitute adequate provocation. The test for sufficiency of provocation is objective, not subjective.

13.

An appellate court is statutorily precluded from reviewing any sentence that is imposed within the presumptive sentence set forth in the applicable grid box.

Appeal from Sedgwick District Court; TERRY L. PULLMAN, judge. Opinion filed April 24, 2015. Affirmed in part, reversed in part, dismissed in part, and remanded with instructions.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, for appellant.

*Julie A. Koon* and *Boyd K. Isherwood*, assistant district attorneys, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., GREEN, J., and JOHNSON, S.J.

STANDRIDGE, J.:  Travis M. Knighten appeals from his convictions for one count of second-degree intentional murder and one count of aggravated battery, arguing the district court erred in denying his challenge based on *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), in failing to require his presence during a critical part of the proceedings, and in failing to deny his request for an instruction on the lesser offense of voluntary manslaughter. Knighten also argues the district court violated his Sixth and Fourteenth Amendment rights by sentencing him without requiring either the

4

aggravating factors or his criminal history score to be proven to a jury beyond a reasonable doubt.

FACTS

At around 2 a.m. on May 7, 2011, Carl Meridy, Kedrick Harrison, and Mario Brown went to a night club located at the corner of 13th and Hillside in Wichita. When they got to the club, it was closed, so they hung out in the parking lot. There were approximately 50-80 people in the parking lot at the time. Many people were leaving in their cars.

While Meridy was standing in the parking lot, he saw a dark-colored sport utility vehicle (SUV) pull up. He and another witness saw a hand holding a gun reach out of the front passenger side window of the SUV and fire shots. Meridy was struck by bullets in the right leg and the left arm. Brown was also struck by bullets in the back, shoulder, chest, and thigh. Brown and Meridy were both transported to a hospital. Meridy was treated and survived to testify at trial. Brown ultimately was pronounced dead at 3:35 a.m.

Witnesses at the scene described the SUV as a black vehicle with a white roof. They could not provide an exact make and model but told police it looked boxy, like a military vehicle. Later, the police recovered security footage belonging to a neighboring business and were able to determine that the SUV was a Toyota FJ Cruiser. The police identified Addison Buck as the owner of the vehicle. When interviewed, Buck told police that she believed her boyfriend, Arthur Gary, had the SUV on the night of the shooting.

The police were not able to immediately locate Gary and believed he may have left Wichita. In December 2011, about 7 months after the shooting incident, Detective Tim Relph learned that Gary might be back in town. Relph attempted to contact Gary

5

through Buck. Gary later called Relph and agreed to meet him. When they met, Gary told Relph that four people were with him in the SUV at the time of the shooting: Jasper Gray, Ebony James, Dashawn Robertson, and Knighten. Gary said he was driving and Knighten was sitting in the front passenger seat. As they drove through the parking lot of the club, someone started walking toward the SUV and gesturing. Gary then saw Knighten pull a gun out of his pants pocket and fire it.

Knighten was charged with first-degree murder and aggravated battery. He pled not guilty to both counts, and his case proceeded to jury trial. After voir dire concluded, both the State and Knighten raised *Batson* challenges. Knighten's *Batson* challenge was based on the State's decision to strike two of the four potential African-American jurors from the jury pool. The State, on the other hand, claimed that Knighten had struck a disproportionate number of white males from the jury pool. The district court denied both *Batson* challenges.

At trial, the jury heard testimony from all the passengers in the SUV except Knighten. Gary passed away prior to trial, so his preliminary examination testimony was read to the jury. Gary testified that he was driving the SUV and Knighten was in the passenger seat at the time of the shooting. He said that a man he did not know started walking up to the SUV making gestures. He observed Knighten take a gun out of his pants pocket and fire it. Gary also stated that after the shooting, Knighten told him that he was sorry that the incident had happened in the vehicle.

Ebony testified that she was sitting in the back seat on the passenger side and that Knighten was in the front passenger seat. She said she put her head down as soon as she heard shots and did not know whether the shots came from inside or outside the vehicle. She testified that she never actually saw a gun.

6

Jasper testified that she was sitting in the middle of the back seat of the SUV at the time of the shooting and Knighten was in the front passenger seat. Jasper said she also put her head down as soon as she heard shots and did not see where the shots were coming from. This testimony, however, conflicted with earlier statements she made in an interview with Relph when she identified Knighten as the individual who fired the gunshots.

Robertson testified that he was in the back middle seat and, like the rest of the occupants, confirmed that Knighten was in the front passenger seat. Robertson said that when the group got to the parking lot of the club, somebody came up on the SUV like "they was feeling some kind of war." Robertson testified that he did not see a gun or weapon of any kind in the hands of the person who was approaching the vehicle but that the individual was with a large group of guys walking up to the SUV. He testified that soon thereafter, Knighten started shooting at them.

Knighten did not testify. But his older sister, Sheronda Knighten, and his cousins, Kendra Hunter and Shaquala Horn, all testified that Knighten was babysitting Sheronda's daughter on the night of the shooting.

After the close of evidence, Knighten requested that the jury be instructed on voluntary manslaughter as a lesser included offense of the first-degree murder charge. The district court denied the request.

During deliberations, the jury asked two questions in writing. The district court held a conference in chambers with the attorneys to discuss the questions and how to respond. Then, the district court conducted a hearing on the record to discuss the proposed answers. Knighten was present at the hearing. During the hearing, the attorneys for both sides approved the proposed responses on the record. Knighten's attorney also informed the court that he had discussed the matter with Knighten and that Knighten

seemed fine with the decision not to object to the answers. The district court judge then instructed the bailiff to deliver the written answers to the jury. The jury eventually found Knighten guilty of intentional second-degree murder and aggravated battery.

Prior to sentencing, Knighten filed a motion requesting a durational departure sentence. The motion was denied. The district court sentenced Knighten to 285 months' imprisonment for his second-degree murder conviction. It also sentenced him to 9 months' imprisonment for his aggravated battery conviction. The district court ordered that the sentences should run consecutively.

ANALYSIS

On appeal, Knighten claims the district court erred (1) by denying his *Batson* challenge without requiring the State to provide race-neutral reasons for striking two potential jurors; (2) by failing to include Knighten in its meeting with counsel to discuss questions asked by the jury during deliberations; (3) by denying his request to instruct the jury on the lesser offense of voluntary manslaughter; (4) by sentencing him without requiring either the aggravating factors or his criminal history score to be proven to a jury beyond a reasonable doubt; and (5) by violating his constitutional rights. We discuss each of Knighten's claims of error in turn.

1. Batson *challenge*

In *Batson*, the United States Supreme Court determined that the Equal Protection Clause forbids the State from challenging potential jurors solely on account of their race. 476 U.S. at 89. District courts use a three-step analysis to resolve *Batson* challenges, and each step has a distinct standard of review on appeal. *State v. McCullough*, 293 Kan. 970, 992, 270 P.3d 1142 (2012).

First, a defendant must make a prima facie showing that the prosecutor exercised peremptory challenges on the basis of race. This court exercises plenary review over this question. In the second step, the burden shifts to the prosecutor to give race-neutral reasons for striking prospective jurors. In this step, the prosecutor only has the burden of production, not persuasion, so unless a discriminatory intent is inherent in the answer, the offered reason will be deemed race-neutral. Finally, the district court must determine whether the defendant ultimately carried his or her burden of proving purposeful discrimination. Appellate courts review the district court's determination for abuse of discretion. *McCullough*, 293 Kan. at 992.

At the beginning of the *Batson* hearing in this case, the following exchange occurred:

"THE COURT:  Before we get to the *Batson*, I will note the State struck two black males [and] one Hispanic male. Defense has struck one apparent female. I will note the majority of the panel composed is white. I didn't really have a head count on gender.

"Mr. Owens, you raised the *Batson* issue first. Go ahead, please.

"MR. OWENS [defense counsel]:  There were limited numbers of African-American potential jurors. I believe there were four. Half of them have been struck. And State needs to give a race neutral reason.

"THE COURT:  If I find there's a purposeful pattern of discrimination. I will note they have also left on [R.H.], number 22, who[] is a black male, as you have as well. And [C.E.], number 24, a black female, as you have also. Okay."

A short time later, after discussing the State's reasons for raising its *Batson* challenge, the following exchange occurred:

"THE COURT:  You guys really want to throw the panel out and start over brand new? If you want to, I'm happy to do it. It won't be me. It will be somebody else. You guys want to throw it out, let's throw it out. Your choice, your call.

9

"State want to throw the panel out? No, it is your call, Jennifer [Amyx, prosecutor], you made the request. Do you want to throw the panel out?

"MS. AMYX: No.

"THE COURT: Do you want to throw the panel out, Mr. Owens?

"MR. OWENS: No.

"THE COURT: Is there really a *Batson* challenge? Or are we just posturing?

"MS. AMYX: Judge, it is not posturing when the first four come out and then it changes so . . .

"MR. OWENS: Just for the record, one of the primary things that I would put a minus by boxes would be individuals that appeared to be handgun enthusiasts. Not all of those I struck, but they tended to be white males.

"THE COURT: I'm not asking for a race, gender, or any kind of neutral explanation at this point. I saw the selection, I saw the individuals, I heard their answers. I'm aware that quite honestly on race alone the State wins on the number of strikes to minorities.

"I'm not going to find any purposeful pattern or discrimination by either side, and I will deny the *Batson* challenges on both sides. I think what we have is a pretty representative jury.

"If either side wants to place race or gender neutral reason on the record, you can. I will give you that choice.

"Mr. Owens, you want to add to what you've already said?

"MR. OWENS: No, Your Honor.

"THE COURT: Ms. Amyx.

"MS. AMYX: No, Judge.

"THE COURT: All right. We're closed."

Knighten argues that the district court erred by denying his *Batson* challenge without engaging in the requisite analysis. Specifically, Knighten asserts the district court erroneously failed to engage in the first two steps of the *Batson* analysis and instead ruled only on the ultimate question of discrimination set forth in the third step.

To establish a prima facie case of intentional racial discrimination as required in the first step of the *Batson* analysis, the defendant must show that the prosecutor has

10

exercised peremptory challenges to remove venire members from the jury and that this fact, along with any other relevant circumstances, raises an inference that the government used the peremptory challenges to exclude members of the venire panel on account of their race. *State v. Edwards*, 264 Kan. 177, 193-94, 955 P.2d 1276 (1998) (acknowledging that the holding in *Batson* was expanded by the United States Supreme Court in *Powers v. Ohio*, 499 U.S. 400, 415, 111 S. Ct. 1364, 113 L. Ed. 2d 411 [1991], to prohibit striking minority jurors who are a different race or ethnicity than the accused). Upon review of the record, it appears the district court did not decide whether Knighten made a prima facie showing of race discrimination under *Batson*. But Knighten argues that the preliminary issue of whether the defendant has made a prima facie showing becomes moot if the trial court went on to rule on the ultimate question of discrimination. See *State v. Bolton*, 271 Kan. 538, 540-41, 23 P.3d 824 (2001) (citing *Hernandez v. New York*, 500 U.S. 352, 359, 111 S. Ct. 1859, 114 L. Ed. 2d 395 [1991]; *Edwards*, 264 Kan. at 194). The parties do not dispute that the district court in this case did, indeed, rule on the ultimate question of discrimination here. Accordingly, we find the issue of whether Knighten met his prima facie burden is moot. See *Bolton*, 271 Kan. at 540-41.

But our finding of mootness with regard to the first step of the *Batson* test is not determinative of Knighten's claim of error on appeal. Specifically, Knighten asserts the court abused its discretion by deciding the State did not engage in a purposeful pattern of discrimination under the third step without deciding whether the State met its burden to produce race-neutral reasons for striking the jurors at issue under the second step. "A district court abuses its discretion when:  (1) no reasonable person would take the view adopted by the judge; (2) a ruling is based on an error of law; or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion is based. [Citation omitted.]" *State v. Smith*, 299 Kan. 962, 970, 327 P.3d 441 (2014). Substantial competent evidence is that which

11

"'possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can *reasonably* be resolved. In other words, substantial evidence is such legal and relevant evidence as a *reasonable* person might accept as being sufficient to support a conclusion.' (Emphases added.) *Drach v. Bruce*, 281 Kan. 1058, Syl. ¶ 2, 136 P.3d 390 (2006), *cert. denied* 549 U.S. 1278 (2007)." *State v. Gonzalez*, 290 Kan. 747, 757, 234 P.3d 1 (2010).

To that end, Knighten claims the court erred as a matter of law by deciding the State did not engage in purposeful discrimination under the third step without first deciding whether the State met its burden of production under the second step. Knighten also claims the district court erred as a matter of fact because there is no evidence in the record, let alone substantial competent evidence, to establish that the State had a race-neutral reason for striking the two African-American jurors. See *McCullough*, 293 Kan. at 992 (the burden to provide race-neutral reasons for striking prospective jurors is only one of production, not persuasion and, unless a discriminatory intent is inherent in the answer, the offered reason will be deemed race-neutral).

In support of his request to remand the matter for a new trial or for a proper *Batson* hearing based on this alleged abuse of discretion, Knighten compares the facts in his case to those in *Bolton*. In deciding the *Batson* issue in *Bolton*, the district judge stated that he relied on a review of his own notes regarding the jurors who were challenged and the objections lodged. 271 Kan. at 540. On appeal, the Kansas Supreme Court specifically held that "[i]n the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Bolton*, 271 Kan. at 541 (citing *Hernandez*, 500 U.S. at 365). Upon review of the record, however, the *Bolton* court found no evidence to support a finding that the State relied on race-neutral reasons for striking the jurors. Given this lack of evidence, the court held there was insufficient evidence upon which to decide whether the reasons offered by the State for striking the jurors revealed an inherently discriminatory intent or whether the offered reason should be deemed race-neutral. Given appellate courts do not

12

have the opportunity to see or hear examination of the jurors, the court remanded the matter to the district court for a *Batson* hearing. *Bolton*, 271 Kan. at 544-45.

In this case, the district judge specifically advised the parties during the *Batson* hearing that he was "not asking for a race, gender, or any kind of neutral explanation at this point." The judge then denied Knighten's *Batson* challenge, stating, "I saw the selection, I saw the individuals, I heard their answers. I'm aware that quite honestly on race alone the State wins on the number of strikes to minorities. I'm not going to find any purposeful pattern of discrimination by either side." Although the court eventually provided the State an opportunity to place race-neutral explanations on the record *after* denying Knighten's *Batson* challenge, the State declined to do so.

As in *Bolton*, there is insufficient evidence in this record to decide whether the State's decision to strike the jurors was discriminatory or race-neutral. In order to determine whether the reasons offered by the State for striking the jurors revealed an inherently discriminatory intent or whether the offered reason should be deemed race-neutral, we necessarily must have before us some reason why the State decided to strike the African-American jurors. The record reveals that the district court relied on its own notes and experiences from the jury selection process to determine the ultimate question of discrimination instead of asking the State to provide race-neutral reasons for striking the African-American jurors. As such, we find the court erred as a matter of law in ruling that the State did not engage in a purposeful pattern of discrimination without first requiring the State to produce race-neutral reasons. And in the absence of any race-neutral reasons by the State for striking the jurors that it did, we also find the court's ruling lacks substantial competent evidence in the record. For both of these reasons, we conclude the district court abused its discretion in finding the State did not engage in a purposeful pattern of discrimination and, as our Supreme Court did in *Bolton*, we remand this matter for a proper *Batson* hearing. See *Bolton*, 271 Kan. at 544-45.

13

2. *Defendant's presence at all critical stages of trial*

Knighten argues the district court violated his constitutional and statutory rights to be present at every critical stage of his trial. Although Knighten did not raise this issue below, our Supreme Court recently held that the personal nature of a defendant's statutory and constitutional rights to be present at all critical stages means that they cannot be waived by counsel's mere failure to object. *State v. Verser*, 299 Kan. 776, 788, 326 P.3d 1046 (2014). We therefore will address Knighten's argument, which raises a question of law over which this court exercises unlimited review. 299 Kan. at 787.

While deliberating, the jury in this case submitted two written questions to the district court through the bailiff. The first question was: "Further define 'great bodily harm' [and] does it include gunshot wounds?" The second question was: "Is touching physical contact by a bullet?" The district court held a conference in chambers to discuss the questions and how to respond. After this conference, the district court conducted a hearing on the record to discuss the proposed answers. Knighten was present at the hearing. The proposed answers presented by the court at the hearing stated:

> "1.  In addition to the definition of 'great bodily harm' provided in instruction 10, Kansas does not provide a statutory definition. It is a phrase of common words to be given their ordinary meaning by the jury.
> "2.  Physical contact by a bullet can be considered touching. That is up to the jury's view of the evidence."

The attorneys for both sides approved these responses on the record at the hearing. Knighten's attorney also informed the court at the hearing that Knighten seemed fine with the decision not to object to the answers. The district court judge then instructed the bailiff to deliver the written answers to the jury.

14

Knighten contends the district court violated his constitutional and statutory rights to be present at every critical stage of his trial by (1) improperly providing a written answer to the questions instead of providing the answers to the jury in open court with him present and (2) improperly excluding him from the initial discussion in chambers held to discuss how to answer the two questions from the jury. Under the Sixth Amendment to the United States Constitution, a defendant has the right to be present at every critical stage of his or her trial. See *State v. King*, 297 Kan. 955, 968, 305 P.3d 641 (2013). K.S.A. 2014 Supp. 22-3405(a) similarly provides that a defendant in a felony case must be present at every stage of his or her trial.

   a. *Written answer*

   K.S.A. 2014 Supp. 22-3420 sets forth the procedure to be used by a district court in answering questions from the jury. The statute was amended during the 2014 legislative session, and the amendments became effective on July 1, 2014. Although not raised by either party, section (d) of the amended statute requires the court to "respond to all questions from a deliberating jury in open court *or in writing*" and the defendant to be "present during any response *if given in open court*, unless such presence is waived." (Emphasis added.) K.S.A. 2014 Supp. 22-3420(d). Prior to the amendment, the statute contained no provision for answering jury questions in writing. See K.S.A. 22-3420(3). Because subsection (f) of the amended statute expressly states that the amendments set forth in K.S.A. 2014 Supp. 22-3420 are procedural in nature and must be construed and applied retroactively, the district court's decision to provide a written response to the jury's questions does not violate the statute. K.S.A. 2014 Supp. 22-3420(d), (f).

   Although no statutory rights are implicated due to the express retroactivity of the amendments, the Kansas Supreme Court recently held in *Verser* that a defendant's rights under the Sixth Amendment also are violated if the court provides a written answer to a jury question without the defendant present in the jury room when the written answer is

15

received. 299 Kan. at 788-89. We note, however, that the constitutional violation found by the court in *Verser* was inextricably intertwined with its finding of a statutory violation under the prior version of K.S.A. 22-3420. Thus, we question whether a constitutional right under the Sixth Amendment still exists in the absence of an underlying statutory right to have the court respond to jury questions verbally in open court with the defendant present. We find it unnecessary to answer this question today, however, because even if there was a constitutional violation under the facts presented in this case, any resulting error was harmless.

When a defendant suffers a violation of his or her right to be present, Kansas courts apply the federal constitutional harmless error test. *State v. Gleason*, 299 Kan. 1127, 1182, 329 P.3d 1102 (2014), *cert. granted* 83 USLW 3290 (2015). Under this test, an error is only harmless where the party benefitting from the error persuades the court "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict." *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 3d 705, *reh. denied* 386 U.S. 987 [1967]). Four factors are relevant to this analysis:

> "(1) the strength of the prosecution's case; (2) whether the defendant lodged an objection; (3) whether the communication concerned some critical aspect of the trial or was instead an innocuous and insignificant matter, as well as the manner in which the communication was conveyed to the jury; and (4) the ability of a posttrial remedy to mitigate the constitutional error." *State v. Bowen*, 299 Kan. 339, 357, 323 P.3d 853 (2014).

With regard to the first factor relevant to our harmless error analysis, we find the prosecution's case here was strong. Every other passenger of the SUV testified that Knighten was in the SUV at the time of the shooting, and two passengers testified that

16

they saw Knighten fire the shots that killed Brown and injured Meridy. Therefore, this factor weighs in favor of a finding that the error was harmless.

With regard to the second factor, Knighten did not lodge an objection below. This also weighs in favor of harmless error.

As to the third factor, we find the substance of the jury's questions related to a critical aspect of the trial: the elements of aggravated battery. But we also find the district court's written responses to the jury questions were correct statements of law and could not have contributed to the verdict. The jury's questions asked for further definition of great bodily harm and if physical contact by a bullet constituted "touching." The court responded to the first question by correctly referring the jury to the definition of great bodily harm provided in jury instruction 10 and stating that Kansas does not provide a statutory definition of great bodily harm. In response to the second question, the court correctly responded that "[p]hysical contact by a bullet can be considered touching. That is up to the jury's view of the evidence." In its responses, the district court did not misstate the law, did not provide additional information, and did not place any emphasis on whether the jury should find Knighten guilty or not guilty.

Regarding the fourth factor, both Knighten and his counsel were aware of the procedure used to respond to the jury's questions but chose not to pursue any posttrial remedies. Thus, this fourth factor also weighs in favor of harmless error.

Because none of the factors to be considered in the harmless error analysis weigh in favor of Knighten, we conclude beyond a reasonable doubt that the court's decision to provide written answers to the jury without Knighten's presence instead of verbal answers in open court had no impact on the outcome of the trial and, therefore, was harmless.

17

b. *Chambers conference*

Next, Knighten contends the district court violated his constitutional and statutory rights to be present at every critical stage of his trial by improperly excluding him from the initial discussion in chambers held to discuss how to answer the two questions from the jury. Because the statutory language clearly expresses the legislature's intent that it be applied retroactively, we must utilize the amended statute in conducting our analysis. To that end, K.S.A. 2014 Supp. 22-3420(d) specifically requires the defendant to be present during the discussion of any written questions presented by the jury, unless the defendant has waived his or her presence. Although Knighten does not deny he was present at the initial conference in chambers, he alleges we must presume he was improperly excluded because there is no evidence in the record affirmatively establishing his presence or his waiver. See *State v. Jackson*, 49 Kan. App. 2d 116, 138-39, 305 P.3d 685 (2013), *rev. denied* 299 Kan. __ (May 29, 2014). We agree that the lack of evidence establishing his presence or his waiver requires us to presume that Knighten's rights under K.S.A. 22-3405 and the Sixth Amendment were violated and constitutes error. See *Verser*, 299 Kan. at 788 (a violation of the procedural requirements set forth in K.S.A. 22-3420 violates both K.S.A. 22-3405 and the Sixth Amendment).

Nevertheless, we find this error was harmless. As set forth above, there are four factors relevant to deciding whether an error is harmless under the federal constitutional harmless error test. See *Ward*, 292 Kan. at 569 (an error is harmless under the federal constitutional harmless error test when the party benefitting from the error persuades the court "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict"). Again, these four factors are

> "(1) the strength of the prosecution's case; (2) whether the defendant lodged an objection;
> (3) whether the communication concerned some critical aspect of the trial or was instead

18

an innocuous and insignificant matter, as well as the manner in which the communication was conveyed to the jury; and (4) the ability of a posttrial remedy to mitigate the constitutional error." *Bowen*, 299 Kan. at 357.

To place our discussion of these four harmless error factors in the context presented here, we reiterate the two questions asked by the jury and initially discussed in chambers when Knighten allegedly was not there. The first question was: "Further define 'great bodily harm' [and] does it include gunshot wounds?" The second was: "Is touching physical contact by a bullet?" The answers ultimately provided to the jury were as follows:

"1.   In addition to the definition of 'great bodily harm' provided in instruction 10, Kansas does not provide a statutory definition. It is a phrase of common words to be given their ordinary meaning by the jury.

"2.   Physical contact by a bullet can be considered touching. That is up to the jury's view of the evidence."

With regard to the first factor relevant to our harmless error analysis, we already have found the prosecution's case here was strong. In support of this finding, we noted that every other passenger of the SUV testified that Knighten was in the SUV at the time of the shooting, and two passengers testified that they saw Knighten fire the shots that killed Brown and injured Meridy. Once again, this factor weighs in favor of a finding that the error was harmless.

With regard to the second factor, Knighten's attorney participated in the initial conference held in chambers but did not lodge an objection to Knighten's alleged absence. Thus, this also weighs in favor of harmless error.

As to the third factor, we again find the substance of the jury's questions related to a critical aspect of the trial but that the district court's written responses to the jury's

19

questions were correct statements of law and could not have contributed to the verdict. Moreover, we find it significant that although there is no affirmative evidence to establish that Knighten was present when the court held the conference in chambers to discuss the jury's questions and how to respond, the court thereafter conducted a hearing on the record to discuss the proposed answers. The record reflects that Knighten was present at this hearing. And at that hearing, the court reviewed the proposed answers that ultimately were given to the jury in response to its questions, the attorneys for both sides approved these responses on the record, and Knighten's attorney informed the court that Knighten seemed fine with the decision not to object to the answers. None of the parties objected to the content of the answers at that time, and no objection to the content of the answers has been raised to date. Given Knighten ultimately did have an opportunity to object and provide input on the answers to be given to the jury, this third factor also weighs in favor of harmless error.

Finally, both Knighten and his counsel were aware of the procedure used to respond to the jury's questions but chose not to pursue any posttrial remedies. Thus, the fourth factor also weighs in favor of harmless error.

Because none of the factors to be considered in the harmless error analysis weigh in favor of Knighten, we conclude beyond a reasonable doubt that based on our consideration of the four factors, Knighten's alleged absence from the initial conference in chambers had no impact on the outcome of the trial and, therefore, was harmless.

3. *Instruction on lesser included offense*

At trial, Knighten requested that the jury be instructed on voluntary manslaughter as a lesser included offense of first-degree murder. The district court declined to give such an instruction, which Knighten now argues was erroneous. K.S.A. 2014 Supp. 22-3414(3) requires a district court to instruct the jury on lesser included offenses where

20

there is some evidence that would reasonably justify a conviction of the lesser included offense. This duty to instruct applies even if the evidence is weak or inconclusive. *State v. Maestas*, 298 Kan. 765, Syl. ¶ 6, 316 P.3d 724 (2014). When an offense includes a lesser included crime, failure to instruct on the lesser crime is erroneous only if the instruction would have been factually appropriate under K.S.A. 2014 Supp. 22-3414(3). *State v. Armstrong*, 299 Kan. 405, 432, 324 P.3d 1052 (2014). Thus, the standard of review for this court is whether, after review of all the evidence viewed in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *Armstrong*, 299 Kan. at 432-33.

Here, a voluntary manslaughter instruction would not have been factually appropriate. Voluntary manslaughter is knowingly killing a human being committed upon a sudden quarrel or heat of passion. K.S.A. 2014 Supp. 21-5404(a)(1). In order to prove voluntary manslaughter, there must have been legally adequate provocation. Provocation is legally adequate to justify a conviction for voluntary manslaughter if it is calculated to deprive a reasonable person of self-control and to cause the defendant to act out of passion rather than reason. Mere words or gestures, however insulting, do not constitute adequate provocation. Finally, the test for sufficiency of provocation is objective, not subjective. *State v. Vasquez*, 287 Kan. 40, 54-55, 194 P.3d 563 (2008).

Upon review of the record, we find no evidence of any provocation in this case. No witness testified that any words were exchanged between the victims and Knighten. Robertson did testify that someone in the parking lot was "feeling some kind of war" and that prior to the shooting, a large group of guys started walking toward the SUV. Robertson affirmatively stated, however, that he did not see a weapon of any kind in anyone's hand other than in Knighten's.

Knighten cites Robertson's testimony and argues that the mere act of walking up to the SUV in a dark, crowded parking lot establishes some evidence of adequate

21

provocation to justify a conviction for voluntary manslaughter. But even viewed in the light most favorable to the prosecution, no evidence appears in the record to suggest that any person provoked Knighten. Thus, a jury could not reasonably convict Knighten of voluntary manslaughter because no evidence of legally adequate provocation was presented to the jury. A voluntary manslaughter instruction would not have been factually appropriate under the circumstances presented here. The district court did not err by declining to instruct the jury on voluntary manslaughter as a lesser included offense.

4. *Use of criminal history to determine criminal history score*

Knighten's presumptive sentence was determined by using his criminal history. He argues that his criminal history was not proved to a jury beyond a reasonable doubt, and therefore his constitutional rights under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), were violated. He concedes in his brief that the Kansas Supreme Court previously rejected this claim in *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002), but states that he includes this argument in order to preserve it for possible federal review. Consequently, his claim fails.

5. *Use of criminal history within sentencing grid box*

Knighten claims that the district court violated his constitutional rights under *Apprendi* by sentencing him to the highest number in the applicable sentencing grid box found at K.S.A. 2014 Supp. 21-6804(a). He argues that, in order to do so, the district court necessarily relied on aggravating factors that were not proved to a jury beyond a reasonable doubt.

First, Knighten misstates the law when he asserts that a district court was required to find aggravating factors in order to impose the highest number in the applicable grid box under the Kansas sentencing guidelines. K.S.A. 2014 Supp. 21-6804(e)(1) clearly

22

states that the district court has discretion to sentence a criminal defendant to any sentence *within* the applicable grid box. Further, K.S.A. 2014 Supp. 21-6820(c)(1) forbids an appellate court from reviewing any sentence within the presumptive sentence for the crime charged. In the context of a sentencing challenge similar to Knighten's, the Kansas Supreme Court expressly ruled that a sentence which falls within a grid block under the Kansas sentencing guidelines may be considered a presumptive sentence and, because it is presumptive, appellate courts lack jurisdiction to review it. *State v. Johnson*, 286 Kan. 824, 840-42, 190 P.3d 207 (2008). Accordingly, we dismiss Knighten's claim of error on this issue.

In sum, we find the district court abused its discretion on the first claim of error presented by Knighten; accordingly, we reverse and remand this matter for the sole purpose of conducting a proper *Batson* hearing to determine whether the State met its burden to produce race-neutral reasons for striking the jurors at issue under the second step of the *Batson* analysis. In light of that determination, the district court must then decide whether the State engaged in a purposeful pattern of discrimination under the third step of the *Batson* analysis. We further find no reversible error with respect to Knighten's second claim of error, no error at all with respect to Knighten's third claim of error, and no jurisdiction to consider Knighten's fourth and fifth claims of error.

Affirmed in part, reversed in part, dismissed in part, and remanded for proceedings consistent with this opinion.