NOT DESIGNATED FOR PUBLICATION

No. 113,292

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JUNIOR SANCHEZ,
*Appellant*.

MEMORANDUM OPINION

Appeal from Seward District Court; CLINT B. PETERSON, judge. Opinion filed September 2, 2016. Affirmed.

*Caroline Zuschek*, of the Kansas Appellate Defender Office, for appellant.

*Russell W. Hasenbank*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., PIERRON and MCANANY, JJ.

*Per Curiam*:  A jury convicted Junior Sanchez of one count of conspiracy to commit aggravated battery. The district court imposed an aggravated presumptive custodial sentence of 41 months.

On appeal, Sanchez raises five challenges:  The district court erred by dismissing a potential juror for cause; the court failed to follow proper procedures under *Batson v. Kentucky,* 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), when he challenged the dismissal of Hispanic members of the venire; there was insufficient evidence to support the conviction; prosecutorial misconduct occurred when the State misrepresented

1

significant facts during closing argument; and the court violated *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), when it imposed an aggravated presumptive sentence without presenting aggravating facts to the jury for a finding. On review of each of these issues, we affirm.

In March 2014, the State charged Sanchez with two counts of aggravated battery, in violation of K.S.A. 2011 Supp. 21-5413(b)(1)(A), and one count of conspiracy to commit aggravated battery, in violation of K.S.A. 2011 Supp. 21-5302.

During voir dire, the district court asked the members of the first panel of possible jurors whether anyone knew Sanchez or any of the victims.

F.G. stated he had known Sanchez from school 6 years ago and had only spoken with him a couple of times. He believed his past acquaintance with Sanchez would not affect his ability to be impartial.

J.C. stated he knew who Sanchez was, but he had never been affiliated with him and his knowledge of Sanchez would not affect his ability to make a fair decision. J.C. advised the court he knew codefendant Feliciano Cruz, as they had been neighbors for a long time, but he had never affiliated with him. J.C. clarified he did not mean "gang affilation," he only meant he had not spent time with Cruz. J.C. said he had been convicted of breaking and entering in 2010 or 2011, but he felt he had been treated fairly.

R.V. and A.L. stated they had known each other in high school, but it would not affect their functioning together on a jury. A.L. did not indicate whether he knew Sanchez or any of the codefendants or witnesses. R.V. stated that he knew codefendant Cesar Meza-Salinas—R.V.'s best friend's older brother—but he stated that it would not be an issue to return a verdict against a codefendant of his best friend's brother.

2

M.G. stated that she and F.G. worked together, but they would not be influenced by each other while on the jury. M.G. stated her brother had been arrested as a juvenile.

The State moved to strike J.C., arguing he could not be impartial based on his statements that he knew Sanchez, knew Sanchez' codefendants, and he admitted to a prior violent crime conviction. Defense counsel opposed, noting that J.C. stated he could be impartial. The district court stated the following in excusing J.C. from the venire:

> "Well, I'm not concerned about your history, [J.C.], and I'm not concerned about any single person that you know in this trial, but it seems like you're just a little too close to all the people in the trial. And I'm not even saying that you wouldn't be able to make a fair decision. I think it would be unfair to you to put you in that position because you might find yourself in the jury room ruling against basically your best friend's brother's group of friends."

The State moved to excuse R.V. on the same basis, stating his friend's brother was Meza-Salinas. The district court denied that request indicating its belief that situation applied only to J.C.

Potential juror J.M. told the district court that he knew Sanchez, who had been a student in his class when he was a teacher and a football player on a team he coached. When asked if that relationship would influence him as a juror, he stated "[p]robably not," as it had been "quite a while." J.M. admitted, however, it could be a little hard for him, but he did not have a personal relationship with Sanchez outside of school. J.M. also indicated he knew codefendant Jesus Carrasco for the same reasons.

The State moved to strike D.M. for cause after she stated her husband was a criminal defense attorney. She had indicated in her questionnaire that was a reason to excuse her from jury duty, but the district court denied the motion.

3

K.Z. stated she knew one of the witnesses, Desirae Wood, as Wood went to school with her oldest son. K.Z. and another potential juror, B.S., stated they knew Wood's mother, but both indicated they would not treat Wood's testimony any differently from that of the other witnesses. A.S. did not think he knew anyone with gang affiliations.

Following voir dire, the State used its preemptive strikes on D.M., F.G., R.V., A.L., A.S., K.Z. M.D., D.L., and C.S. Defense counsel objected, contending the State was removing Hispanics and requested a race-neutral reason. Upon the district court's query, the State first noted it was not just removing Hispanic jurors. Its first preemptive strike went to D.M., and it struck F.G. because she knew the defendant. It struck R.V. and A.L. for close associations with a codefendant.

The State stated it struck A.S. because it was not satisfied with his answers. The court asked defense counsel if he was satisfied with the State's response, but counsel deferred to the court, which then asked the State for more specificity with respect to A.S. The State indicated it had directly asked A.S. several questions and he "looked puzzlingly" before answering and was unable to account for his pause before answering. The State also felt he was not "engaged in the process" and did not look like he was always answering the questions directed to the venire. The court accepted that explanation and denied Sanchez' challenge.

Of the other potential Hispanic jurors, defense counsel struck K.T. Once all strikes were made, the only apparent Hispanic juror remaining was M.G.

The facts of this case are somewhat involved. Michael Spangler testified that he, Rashad Eackles, and Krystal Bowman were visiting Briel Mills at her house on the night of March 3, 2013. Sanchez, Wood, Isabel Carrarra, and a couple of other people were at the house when he arrived. Sanchez, whom Spangler knew only as Wood's boyfriend, seemed to be upset and was arguing with Mills. Spangler went into Mills' room with

4

Eackles and several others. Eackles left the bedroom at one point to use the restroom. Shortly thereafter, Spangler heard a commotion from outside the bedroom and heard something strike the wall hard enough to knock a dresser away from the wall. Spangler opened the bedroom door, Eackles entered the bedroom, and shut the door behind him. Eackles told him they needed to leave, and Spangler saw that he was shaken up and had a bleeding cut on his forearm.

Spangler testified that everyone exited Mills' room, he was the last to leave, and the living room was full of about a dozen men with various objects in their hands, including a tire iron and a bottle. Sanchez stood between Spangler and the door and said something to him he did not recall, and then he was struck over the back of the head. He testified Sanchez was part of the group, as was Cruz, although many of the other people were not in the house when he arrived. After he was struck, he only remembered being face down on the ground while the group stomped and stabbed him, producing five stab wounds and three head wounds. Once he was able to leave, he got into his car and went to the emergency room. His injuries later required surgery.

On cross-examination, Spangler testified he went straight to Mills' room when he entered the house and did not look around the home or the yard to see if other people were present. He stated Sanchez did not directly tell him to leave or accuse him of wanting to do drugs in the house. He admitted to smoking methamphetamine in the bedroom with the others. He did not see Sanchez with a weapon in the house.

On redirect examination, Spangler testified that methamphetamine heightens perception and that Sanchez blocked the exit from the house. He also confirmed that Sanchez spoke to him just before the attack started and was a part of the group of men. On recross-examination, he clarified he did not know whether Sanchez had attacked him.

Eackles testified for the State that he had called Spangler for a ride home on March 3, 2013, and Spangler took him along to Mills' house. When they arrived, Sanchez, Mills, Wood, Carrarra, and one or possibly two others were present. Sanchez and Mills were arguing. Eackles went into a bedroom with Mills and others, but he left to use the bathroom before leaving the house.

Eackles testified that while he was in the bathroom, Sanchez came into the bathroom and told him he needed to leave. Two other men then entered and began swinging at him. He tried to cover himself—but went to the floor and was hit by bottles and other objects. The men began attacking him as soon as Sanchez told him he needed to leave. He was eventually able to leave the bathroom and go back into the bedroom. He told Spangler they needed to leave. There were people in the living room as they left, including four or five he had not seen before. He was hit with a liquor bottle on the way out. The only weapons he noticed were a liquor bottle and a tire iron, but he was not looking closely on the way out of the house.

Eackles testified Sanchez was in front of the group of assailants, telling him and Spangler to get out. All but two of the assailants had arrived after he and Spangler first went into the bedroom. He was able to see most of the two-bedroom house as he walked through, although not the kitchen. He did not see the attack on Spangler. Eackles went to the emergency room and later had surgery.

On cross-examination, Eackles testified that although he did not go into the other bedroom in the house, it was visible from the hallway. He acknowledged that other people could have been in the backyard or the kitchen. He could not state definitively whether Sanchez had hit him when he was in the bathroom.

Krystal Bowman testified for the State that she had driven Spangler and Eackles to Mills' house. Sanchez, Wood, a woman, and another person named Junior were at the

6

house when she arrived. Sanchez was in a "really bad" mood. She went with others to a bedroom. After Eackles left to go to the bathroom, she heard a big bang, and a dresser and vanity fell over from against the wall. Spangler opened the door and Eackles came in, severely bleeding from his arm. About four men were rushing the door when Eackles came in.

Bowman testified that when she, Spangler, and Eackles tried to leave the house, they were attacked by about 13 people armed with bottles, crowbars, knives, and hammers. She did not recognize the men, other than Sanchez, nor had she seen them at the house when she arrived. She saw Sanchez hit Eackles over the head with a bottle. After getting Eackles into her car, she saw Sanchez and others standing over Spangler with knives. She saw Eackles' cut arm and later saw three or four knife wounds on Spangler.

On cross-examination, Bowman testified she could not remember how many crowbars she saw, but she saw five or six knives and four or five people holding bottles. Defense counsel asked her whether she told police she had seen Ramon Ortega hit Eackles on the head with a bottle. She denied this and stated that she told the detective she had seen Sanchez do it. She acknowledged she had indicated it was Ortega, but, upon seeing Sanchez' face, she determined it was Sanchez. On redirect examination, she verified that Sanchez was the person who had broken a bottle over Eackles' head.

Isabel Carrarra testified for the State that she had known Sanchez since she was a child. She had known Eackles for a couple of years and had met Spangler through him. She stated that she was part of the North Side gang and she knew Sanchez was part of the South Side gang. She believed Cruz was also a member of South Side by how he presented himself. She was at Mills' house on the night in question, trying to sleep in Mills' room while Spangler and Eackles were there. After Eackles left to go to the bathroom, she heard a ruckus that shook the walls. She opened the door and saw Eackles

on the floor surrounded by a group that included Sanchez. She could not see Eackles' injuries, and she was able to get him to the bedroom. As she tried to leave the house with the group, a group of more than 10 men armed with bottles, knives, and brass knuckles attacked Spangler and Eackles. The perpetrator she saw was named Cruz and he was not present in the courtroom. She did not know a lot of the other men but had seen them before with Sanchez and Cruz and assumed they were part of the South Side gang. She believed that if she did not stop the attack and help get Eackles and Spangler out of the house they could have died.

On cross-examination, Carrarra stated she saw Cruz hit Eackles with a bottle in the living room, but she did not see Sanchez hit anyone and could not recall if he kicked anyone. Sanchez did not appear to actually attack anyone, but he was angry with Mills. On redirect examination, she testified Sanchez was yelling and showing hostility and he did not try to stop anyone from attacking. On recross-examination, she stated Sanchez was not orchestrating the conduct of the attackers but was encouraging their behavior by yelling at Eackles and Spangler that they should have left his house.

Detective Josh Olson testified and identified pictures of the scene that showed blood and broken glass on the floor and blood on the wall. Additional pictures showed the wounds to Eackles' forearm and wounds to Spangler's head and back. Detective Olson identified gang worksheets the police use to track known gang members and enter them into an online database, including a worksheet for Sanchez. Sanchez, Cruz, and other codefendants were identified as being part of the same gang, although Cruz was part of a different subset of the gang.

Olson testified he interviewed Eackles at the hospital. Although Eackles was initially reluctant to report the attack, he ultimately stated a group of people had attacked him at Sanchez' house and Sanchez was part of the group. Olson interviewed Carrarra in the weeks after the attack. She told him that Sanchez had participated in the attack and

8

yelled "[g]et out of my house" while others shouted "South Side." Spangler identified Sanchez as one of the people who attacked him, as did Bowman and each person Olson interviewed.

On cross-examination, Olson testified Spangler said he could not be sure whether Sanchez had struck him or was just part of the group. Eackles identified Sanchez as one of the three people in the bathroom during the first attack, but he could not be sure whether Sanchez had struck him.

Defense counsel moved to dismiss the conspiracy charge or the charge alleging assault against Spangler, arguing the State had failed to present adequate evidence to support those charges. The State responded Carrarra had testified Sanchez called the assailants to the house, including the codefendants who had pled to other charges, and the assailants had acted at Sanchez' behest. With respect to the attack on Spangler, the State argued evidence supported the charge under an aiding and procuring theory. Defense counsel challenged the State's characterization of Carrarra's testimony and its application of the aiding and procuring theory. The district court found sufficient evidence supported the battery charges under an aiding and abetting theory. With respect to the conspiracy charge, the judge stated: "I believe that at a bare minimum there's plenty of circumstantial evidence to support a prima facie showing that a conspiracy was made that evening among the participants of these violent acts." The court denied the motion to dismiss, and the defense declined to present evidence.

In its closing argument, the State told the jury that Carrarra testified Sanchez had called the assailants to the house, providing direct evidence of conspiracy. The presence of the men at the house when Spangler and Eackles were attempting to leave, but not earlier when they arrived, provided circumstantial evidence that Sanchez, in his anger, procured them by calling them to his home. In total, when discussing Carrarra's testimony, the State indicated three times that Sanchez called the men to the house. The

9

State concluded its initial closing argument by saying, "[W]ho was at the center of that storm? Every story tells you the same thing, Junior Sanchez. Junior Sanchez confronted [Eackles] in the bathroom. Junior Sanchez called his fellow gang members to participate in the attack that night."

Following defense counsel's closing argument, the State opened its rebuttal by quoting Carrarra's testimony: "I mean, he must have called them, he must have." The State reiterated its claim that Sanchez had procured the assailants.

After deliberations, the jury found Sanchez not guilty of the battery charges but guilty on the conspiracy count. Sanchez was sentenced to 41 months' imprisonment, the presumptive aggravated sentence.

Sanchez first argues the district court based its decision to excuse J.C. for cause from the venire on errors in facts and law, leading to an abuse of discretion. The court indicated that J.C. had a best friend whose brother was a codefendant and J.C. was "too close to all the people in the trial." Sanchez alleged that applied to a different potential juror, and the lack of substantial competent evidence supporting the court's factual findings caused a per se abuse of discretion. Sanchez contends the court also excused J.C. for reasons not supported by law, also yielding a per se abuse of discretion. Analogizing from federal capital cases, Sanchez argues the court's action prejudiced him by giving the State an extra peremptory strike, and the wrongful exclusion of a potential juror can never be harmless error, mandating reversal.

The State argues sufficient facts of J.C.'s familiarity with a codefendant and his criminal history supported the district court's ruling on the State's motion to strike him for cause. As such, the court did not abuse its discretion. The State contended that in the absence of demonstrated error, it did not need to address Sanchez' argument with respect to prejudice.

10

To prevail, Sanchez must establish the trial court erred and that he was prejudiced. See *State v. Ransom,* 289 Kan. 373, 389, 212 P.3d 203 (2009). Appellate courts review the trial court's ruling on a challenge for cause for an abuse of discretion because the trial court is in a better position to view the prospective jurors' demeanors as they are questioned. The party asserting an abuse of discretion bears the burden of establishing it. 289 Kan. at 389. A district court abuses its discretion when it makes a decision that is based on an error of law or fact; or when it makes a decision that is otherwise arbitrary, fanciful, or unreasonable. *State v. Wilson*, 301 Kan. 403, 405, 343 P.3d 102 (2015).

Prejudice cannot be established through the loss of a peremptory challenge alone. "'"[T]he loss of a peremptory challenge [does not] constitute[] a violation of the right to an impartial jury."'" *State v. McCullough*, 293 Kan. 970, 996, 270 P.3d 1142 (2012) (quoting *State v. Crawford*, 255 Kan. 47, 51–52, 872 P.2d 293 [1994]).

It is clear from the record that the district court confused J.C. for R.V. when it granted the State's motion to strike J.C. for cause. The court referenced a relationship between a codefendant and a friend that was never discussed by J.C., only R.V. The record also suggests the court would not have granted the motion in the absence of its confusion, as it denied the State's request to dismiss R.V. on the same grounds as J.C. while noting it believed that R.V. did not have the contacts with the codefendants that it had mistakenly ascribed to J.C. Regardless of whether other facts may have supported the court's decision, the court clearly based its ruling on an error of fact, but Sanchez still bears the burden of demonstrating prejudice.

Sanchez does not argue that he suffered any particular prejudice. Instead, he argues the district court functionally gave the State an extra preemptory strike by erroneously granting the motion to strike J.C. for cause. As such, the State had an unbalanced advantage in determining the composition of the jury. Recognizing this

11

argument is a matter of first impression for Kansas courts, Sanchez rests his argument on a death penalty case from the United States Supreme Court. While Kansas appellate courts have not specifically addressed Sanchez' argument, the Kansas Supreme Court has previously addressed situations where a party alleged an imbalance in peremptory strikes, specifically where a denial of a motion to strike for cause "forced" a party to use a peremptory strike. See *McCullough*, 293 Kan. at 996 ("Peremptory challenges are simply a means to achieve an impartial jury, and the true inquiry is whether the jury that ultimately sits is impartial.").

In *McCullough*, the defendant alleged the district court erred by denying five motions to strike jurors for cause, causing him to use peremptory challenges on those jurors rather than on other jurors. But the *McCullough* court noted that the loss of a peremptory challenge alone could not establish prejudice in a ruling on a motion to strike for cause. 293 Kan. at 996. In both *McCullough* and this case, the defendants argued the district court erred in a ruling on a motion to strike and, as a result, the State wound up with more effective peremptory challenges. The only distinction is that McCullough argued she lost peremptory challenges while Sanchez contends the State received an extra peremptory challenge. This seems to be a more closely analogous case than a death penalty case dealing with the exclusion of jurors in a capital case solely because they voiced opposition to the death penalty. See *Gray v. Mississippi*, 481 U.S. 648, 658-66, 107 S. Ct. 2045, 95 L. Ed. 2d 622 (1987). Using *McCullough* as guidance, Sanchez is required to show specific prejudice from the erroneous exclusion of J.C. from the jury, and he has explicitly declined to do so. 293 Kan. at 996. Accordingly, in the absence of a showing of prejudice, we find that Sanchez has failed to meet his burden to show error.

Sanchez next argues the district court violated his right to a fair trial under the Fourteenth Amendment to the United States Constitution by allowing the State to use peremptory strikes against Hispanic venire persons without a race-neutral explanation, which is unlawful under *Batson v. Kentucky*, 476 U.S. 79. Sanchez alleges the court

12

failed to follow proper procedure when, after asking the State for a race-neutral reason for striking the potential jurors, it asked Sanchez' attorney if he found the reason sufficient instead of making its own ruling on the State's proffered reasons, and when it did not permit Sanchez to respond to the proffered reason and prove purposeful discrimination.

The State also struck F.G., R.V., A.L., and A.S., who are presumably Hispanic like Sanchez, and it did so over Sanchez' objection. The State also struck another presumably Hispanic venire person, M.D. In total, the State struck six of the eight Hispanic potential jurors in the 29-person venire, while it only struck three who belonged to other minority groups. Sanchez argues the district court was required to assess the State's facially race-neutral reasons for striking the venire members, but it did not do so and it did not permit Sanchez an opportunity to object before asking him for his next preemptive strike. Sanchez contends the State's proffered reasons do not bear scrutiny, as it failed to strike a white member of the venire who knew Sanchez and a codefendant, whereas knowing either Sanchez or a codefendant was supposedly sufficient to strike a Hispanic person. Sanchez contends that he is entitled to a new *Batson* hearing.

While the State tacitly questions whether Sanchez created an inference of discrimination, it assumes he met the first step under *Batson*. But the State contends it offered plausible nondiscriminatory reasons for its decision to strike each of the challenged jurors with peremptory challenges. Additionally, the State alleges Sanchez was provided an opportunity to object to the State's reasons, but he opted not to do so.

"In *Batson*, the United States Supreme Court held that the Equal Protection Clause applies to the State's privilege to strike prospective jurors through peremptory challenges. When a *Batson* challenge is asserted, a three-step analysis applies; each step is governed by its own standard of review. [Citations omitted.]" *State v. Kettler*, 299 Kan. 448, 461, 325 P.3d 1075 (2014). If the district court failed to conduct a proper *Batson* analysis, the

13

normal remedy is a limited remand addressing the propriety of the peremptory strike. See *State v. Knighten*, 51 Kan. App. 2d 417, 427, 347 P.3d 1200, *rev. denied* 302 Kan. 1016 (2015).

The first step obliges the party challenging the strike to make a prima facie showing that the striking party exercised a peremptory challenge on the basis of race. We apply plenary or unlimited review to the trial court's prima facie determination. *Kettler*, 299 Kan. at 462.

The second step is engaged only if the party challenging the strike successfully makes a prima facie showing. If so, the burden shifts to the striking party to articulate a race-neutral reason for the peremptory strike. The standard of review on the second step is deferential, requiring only a facially valid reason, and the reason will be deemed race-neutral unless it is inherently discriminatory. Despite the shift in the burden of production at the second step, the party challenging the strike still has the burden of persuasion. *Kettler*, 299 Kan. at 461.

The third step then requires the district court to decide whether the party challenging the strike has met its burden of persuasion to show purposeful discrimination by the striking party. Since the third step requires a credibility determination, appellate review is for abuse of discretion. *Kettler*, 299 Kan. at 462. Although not determinative, the court can consider that other members of the same race as the defendant were not struck. *State v. Angelo*, 287 Kan. 262, 274, 197 P.3d 337 (2008).

Sanchez' principal *Batson* argument is largely grounded in a strained construal of the district court's actions during voir dire. Although the district court did ask defense counsel for an assessment of the State's given reasons for exercising its peremptory strikes, the court's consideration of the challenge did not end with Sanchez' deferral to the court. Instead, the court asked the State to further explain its reasons, ultimately accepting

that the State provided nondiscriminatory reasons for exercising its peremptory strikes. As such, the court did not commit either error that Sanchez alleges. The court allowed defense counsel an opportunity to respond to the State's given reasons, which counsel declined, and it made its own finding regarding the propriety of those reasons after it provided counsel with an opportunity to rebut the State's arguments.

Sanchez also appears to challenge the district court's implicit finding that the State satisfied its burden to provide plausible nondiscriminatory reasons for exercising its peremptory strikes as it did. Although Sanchez dismisses the significance of this fact, it is noteworthy that one Hispanic member of the venire, M.G., remained on the jury, and she was not the target of any attempted strikes by the State. See *Angelo*, 287 Kan. at 274.

Additionally, defense counsel struck another Hispanic venire person, K.T., so the paucity of Hispanic members of the jury was not solely the result of the State's challenges. V.R. had a close association with one of Sanchez' codefendants—his best friend's brother—and, despite a claim he would not be bothered to return a verdict against Sanchez, this provided a plausible, nondiscriminatory reason for a preemptive strike. A.L. was struck for knowing R.V., which was also a plausible, race-neutral reason supported by the record. Nothing in the record or the briefs suggests the State's reasons for striking A.S. were pretextual or anything but race-neutral. The court did not abuse its discretion by finding that the State did not discriminatorily strike these individuals from the venire. *Kettler*, 299 Kan. at 461-62.

In a closer case, F.G. indicated that he knew Sanchez from school several years before but had only spoken with him a few times and was not associated in any way with him, drawing a preemptive strike. J.M., on the other hand, both taught and coached Sanchez and a codefendant and associated with Sanchez on a daily basis while he was in school, yet the State did not move to strike him from the venire despite the fact that he seemed to be far more acquainted with Sanchez during school.

In this case, we can consider, although it is not dispositive, that the State appeared to strike a Hispanic member of the venire for a particular reason but failed to strike a non-Hispanic venire person despite marked similarities. *Angelo,* 287 Kan. at 274. Importantly, defense counsel made no effort at voir dire to meet his burden to persuasively argue that the State's decision was motivated by discriminatory intent. Accordingly, there was no basis for the court, which heard all of the potential jurors answer the attorneys' questions during voir dire and could thus make its own implicit credibility determinations, to doubt the State's proffered race-neutral reason for striking F.G. The court did not abuse its discretion by determining the State's decision to strike F.G. was not discriminatory. See *Kettler,* 299 Kan. at 461-62. As such, we affirm.

Sanchez also contends the State's evidence supporting the conspiracy conviction required the jury to impermissibly stack inferences in order to satisfy the agreement element. The State did not present any direct evidence of an agreement or of any effort by Sanchez to actually gather the assailants at the house for the purpose of attacking Spangler and Eackles. He argues the State needed the jury to stack four inferences in order to convict, grounded only in the undisputed fact that there were more people in front of the house when the victims tried to leave than when they arrived: (1) these people were not somewhere else in the house when Eackles and Spangler entered but arrived later; (2) Sanchez called these additional people to the house; (3) Sanchez called them to the house in order to attack Eackles and Spangler; and (4) specifically, Sanchez called these individuals to the house to commit aggravated battery on Eackles and Spangler. No evidence indicated that Sanchez agreed with the others to do great bodily harm to Eackles and Spangler, so insufficient evidence supported the conspiracy conviction.

The State contends there was direct evidence Sanchez was angry, acted confrontationally toward the victims, and continued to speak aggressively to Eackles about leaving the house while others attacked him in the bathroom, allowing for an

16

inference that he had already entered into an agreement with the men to attack Eackles. The assailants were not present when Eackles arrived, and no one else had a reason to call them over, indicating that Sanchez procured the men in order to attack Eackles and Spangler. Additionally, Sanchez' actions during the larger attack provided sufficient evidence to support the conspiracy charge, as he encouraged the attack and, according to Bowman, directly participated in it, demonstrating an agreement and acts in furtherance of the agreement.

Our standard of review provides that "[w]hen the sufficiency of the evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. McClelland*, 301 Kan. 815, 820, 347 P.3d 211 (2015). An appellate court "do[es] not reweigh the evidence or evaluate the credibility of witnesses," as these functions are left to the jury. *State v. Hall*, 292 Kan. 841, 859, 257 P.3d 272 (2011); see also *State v. Van Winkle*, 254 Kan. 214, 225, 864 P.2d 729 (1993) ("On appellate review . . . all questions of credibility are resolved in favor of the State."). Convictions, even of the most serious crimes, may be based on circumstantial evidence. *State v. Longoria*, 301 Kan. 489, 533, 343 P.3d 1128 (2015).

Conspiracy requires proof that the defendant entered into an agreement with another person to commit or assist in the commission of a particular crime and that the defendant or the coconspirator committed an overt act in furtherance of the conspiracy. See K.S.A. 2015 Supp. 21–5302(a). The existence of an agreement does not need to be proved directly. "[I]t is enough if the parties tacitly come to an understanding in regard to the unlawful purpose, and this may be inferred from sufficiently significant circumstances. [Citation omitted.]" *State v. Swafford*, 257 Kan. 1023, 1040, 897 P.2d 1027 (1995); see *State v. Williams*, 299 Kan. 509, 528-29, 324 P.3d 1078 (2014); *State v. Sharp*, 289 Kan. 72, 104–05, 210 P.3d 590 (2009); *State v. Davis,* 284 Kan. 728, 737–38, 163 P.3d 1224 (2007). "An overt act which completes the crime of conspiracy is

17

something apart from the conspiracy . . . [and] it must accompany or follow agreement and must be done in furtherance of the object of the agreement." *State v. Crockett*, 26 Kan. App. 2d 202, Syl. ¶ 4, 987 P.2d 1101 (1999).

Facts can be established at trial either by direct evidence or by circumstantial evidence. Neither is intrinsically more worthy of consideration than the other. In fact, even the most serious crime may be proven by circumstantial evidence. *State v. Scott*, 271 Kan. 103, 107, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001); *State v. Cruz*, 15 Kan. App. 2d 476, 488, 809 P.2d 1233, *rev. denied* 249 Kan. 777 (1991). Nevertheless, a conviction cannot be based solely upon inferences. *Cruz*, 15 Kan. App. 2d at 490. Thus, when a fact is established by circumstantial evidence, the circumstances must be proven and cannot be inferred from other circumstances. *State v. Rice*, 261 Kan. 567, 587, 932 P.2d 981 (1997). But once a fact is proven through circumstantial evidence, the jury may draw reasonable inferences from a fact so proven. 261 Kan. at 587. Thus, there is no impermissible stacking of inferences if each element of the crime charged is supported by substantial evidence, either direct or circumstantial. *State v. Taylor*, 34 Kan. App. 2d 889, 891, 126 P.3d 437 (Kan. App. 2006).

The State principally relied on two pieces of evidence at trial to prove Sanchez entered into a conspiracy with the assailants to commit aggravated battery on Spangler and Eackles, namely testimony from the victims and others that the assailants were not seen at the house when they arrived and Carrarra's testimony that Sanchez must have called the people to the house in order to attack the victims. In its brief, the State also discusses evidence that Sanchez was angry, spoke to the victims about needing to leave the house, and stood with the group while the attack took place, possibly even directly participating in the attack. Notably, there is no direct evidence that Sanchez called a single person to the house, as Carrarra only stated her belief that Sanchez must have been encouraging them, and that belief has absolutely no evidentiary value. No witness testified or was there physical evidence, such as phone records, that demonstrated he

18

called or spoke to anyone about coming over to his house. There is no direct evidence that any such communication was made in order to enter into an agreement to commit aggravated battery. But direct evidence is not necessary, as circumstantial evidence can suffice. *Longoria*, 301 Kan. at 533.

The State urges us to take the same inferential steps that Carrarra made in her testimony. Spangler and Eackles saw some or most of the house when they walked to Mills' room. They did not see the group of people later present in the living room when they tried to leave. Based only on these facts, Sanchez argues that proof of an agreement by him to engage in aggravated battery would require us to infer that the group could not have arrived at his house without having been called, his actually calling them to the house, and the gathering occurring as a function of an agreement to attack the victims. Sanchez argues that this requires an unacceptable stacking of inferences. See *Rice*, 261 Kan. at 587. For the purpose of our opinion, we will presume that Sanchez is right on this point—that the jury could not presume that he called or texted to get the attackers to come to the house.

Even setting aside any inference that Sanchez called the group to the house, however, the State could have proven a conspiracy based on the group's actions once at the house. Whether the group arrived at the house for the purpose of engaging in an attack, they could have still entered into an agreement once at the house to commit the acts underlying aggravated battery. Sanchez was accompanied by two men as he confronted Eackles in the bathroom, and at least the two men attacked him and caused an injury requiring surgery. In the living room, Sanchez yelled at Spangler and Eackles as the others attacked the men with bottles, tire irons, and knives. While the claim is disputed and not entirely consistent with the other evidence, Bowman explicitly identified Sanchez as a direct participant in the living room attack, which, like every other violent act during the attack, would be an act in furtherance of the agreement. This concerted violent action, punctuated by Sanchez' yelling at the victims before and during the

19

attacks, could provide an evidentiary basis for a reasonable inference of guilt by the jury. *Williams*, 299 Kan. at 528-29.

Evidence from the trial, viewed in the light most favorable to the State, would support the necessary inference that Sanchez entered into an at least tacit agreement to attack Spangler and Eackles and cause them great bodily harm. *Rice*, 261 Kan. at 587. As such, we affirm.

Sanchez next argues the prosecutor repeatedly told the jury during closing arguments and rebuttal closing arguments that Sanchez had called men to beat Eackles and Spangler and that this act constituted direct evidence of conspiracy. Sanchez contends no such evidence had been presented. Carrara only testified that she assumed Sanchez called the men to the house, and the prosecutor's clear misrepresentation of the evidence constituted misconduct. He also contends all of the factors militate in favor of our concluding that the misconduct prejudiced him and denied him a fair trial. He argues that the misconduct was gross and flagrant because the prosecutor made an argument and presented a narrative based on facts not in the record and the misstated evidence was central to the case against Sanchez. The prosecutor's ill will is supposedly demonstrated by the fact the misrepresentations were made during arguments that the prosecutor could have planned in advance, the prosecutor made the misrepresentation five times, and the prosecutor repeated the misrepresentation to the district court in response to Sanchez' motion to dismiss the charges.

The State contends its comments during closing arguments were consistent with the evidence. The State argues that even if its statements were not fully supported, its conduct was not flagrant, gross, or motivated by ill will, as it was not emphasized over other evidence. The State argues any error was cured when in its rebuttal closing arguments, it clarified precisely what Carrarra had said. Other evidence of Sanchez' guilt

20

was also sufficiently overwhelming, such that any possible misstatement did not affect the verdict and was harmless.

Preliminarily, a claim of prosecutorial misconduct based on comments made during closing arguments is not evidence, and it will be reviewed on appeal even absent a contemporaneous objection. See *State v. Armstrong*, 299 Kan. 405, 416, 324 P.3d 1052 (2014); *State v. Dull*, 298 Kan. 832, 836, 317 P.3d 104 (2014); *State v. Stevenson*, 297 Kan. 49, 51, 298 P.3d 303 (2013); *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009).

As to the prosecutorial misconduct standard, as explained in *State v. Tosh,* 278 Kan. 83, 85, 91 P.3d 1204 (2004), appellate review of allegations of prosecutorial misconduct requires a two-step process. First, an appellate court determines whether there was misconduct, *i.e.,* whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. *Armstrong*, 299 Kan. at 416 (citing *State v. Bridges,* 297 Kan. 989, 1012, 306 P.3d 244 [2013]; *Tosh*, 278 Kan. at 85). Second, if misconduct is found, the appellate court determines whether those comments compel reversal, *i.e.,* whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *Armstrong*, 299 Kan. at 416.

It is well established that a prosecutor must limit his or her remarks in closing arguments to facts in evidence. *State v. Baker*, 281 Kan. 997, 1012, 135 P.3d 1098 (2006); see *State v. Richmond*, 289 Kan. 419, 440-41, 212 P.3d 165 (2009). Nevertheless, there does not have to be direct evidence of every point argued. "[A] prosecutor is allowed considerable latitude in discussing the evidence and drawing reasonable inferences from that evidence. [Citations omitted.]" *State v. McCaslin*, 291 Kan. 697, 722, 245 P.3d 1030 (2011), *overruled on other grounds by State v. Astorga*, 299 Kan. 395, 324 P.3d 1046 (2014). The Supreme Court has previously held that misconduct occurs when a prosecutor states facts that are not in evidence. See *State v. Ly*, 277 Kan. 386, Syl. ¶ 4, 85 P.3d 1200 (2004) ("It is clearly improper for the prosecutor to state facts

that are not in evidence. When the prosecutor argues facts that are not in evidence, the first prong of the prosecutorial misconduct test is met."). Even if the prosecutor inadvertently misstated Carrarra's testimony, the effect is the same and the error qualifies as possible prosecutorial misconduct. 277 Kan. 386, Syl. ¶ 4.

Turning to the second step, the first of three factors is whether the misconduct was gross and flagrant. In *State v. Lowrance*, 298 Kan. 274, 284, 312 P.3d 328 (2013), the Supreme Court found that arguing facts not in evidence was gross and flagrant misconduct because "every prosecutor should know that he or she cannot make arguments for which there is no evidentiary support." The same result obtains here, as no evidence actually supported the prosecutor's clear and repeated assertion that Sanchez "procured" the assailants. See *State v. Marshall*, 294 Kan. 850, Syl. ¶ 7, 251 P.3d (2012).

The third factor weighs against reversal because the prejudicial effect of the prosecutor's misrepresentation is greatly outweighed by the testimonial evidence demonstrating that Sanchez both encouraged and participated in the concerted attack on Spangler and Eackles. As noted above, this evidence is sufficient to support the conspiracy charge, and the State also made a point to provide the jury with Carrarra's precise testimony during the rebuttal phase of its closing argument, mitigating the effect of the initial claim. See *State v. Marshall,* 294 Kan. 850, 864, 281 P.3d 1112 (2012) (the court considered the contents of the State's rebuttal arguments as a part of its analysis of the flagrancy of and potential ill will underlying a prosecutor's remarks in closing). Viewing the prosecutor's misstatement in light of the entire record, we conclude it was not reasonably possible that the comment contributed to the verdict. *Armstrong*, 299 Kan. at 416.

Finally, Sanchez argues the district court erred by sentencing him to an aggravated presumptive sentence without submitting the existence of aggravating factors as a factual determination to the jury. *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L.

Ed. 2d 435 (2000), requires that a jury find beyond a reasonable doubt any fact used to enhance a sentence. Sanchez argues this renders the Kansas Supreme Court's interpretation of K.S.A. 2015 Supp. 21-6804(e)(1) unconstitutional, as it does not require explicit court fact finding before the imposition of an aggravated sentence. Additionally, Sanchez contends the aggravated sentence should not be considered part of the presumptive sentence, as otherwise there would be no need for the legislature to direct a court to find certain facts before imposing an aggravated sentence. As such, he argues the district court was not permitted to impose an aggravated sentence in the absence of proper fact finding, and it should only have imposed the middle sentence. Sanchez does not address appellate jurisdiction over presumptive sentences.

The State argues that we do not have jurisdiction to review a presumptive sentence. Regardless, the State also contends the imposition of an aggravated presumptive sentence based on mitigating factors not presented to a jury does not violate *Apprendi* or otherwise exceed the sentencing judge's authority.

The Kansas Supreme Court rejected Sanchez' argument in *State v. Johnson*, 286 Kan. 824, 851-52, 190 P.3d 207 (2008) (concluding that the sentencing scheme permitting the imposition of presumptive aggravated sentence without submitting aggravating factors to a jury did not violate *Apprendi* and, upon this finding, ending its analysis as it lacked jurisdiction to review the sentence). The Supreme Court later affirmed it had authority to review challenges to sentencing statutes but it lacked jurisdiction to review individual presumptive sentences, specifically citing *Johnson*. *State v. Huerta*, 291 Kan. 831, 839-40, 257 P.3d 1043 (2011). Separately, the Supreme Court noted: "Under K.S.A. 21-4721(c)(1), an appellate court is without jurisdiction to consider a challenge to a presumptive sentence, even if that sentence is to the highest term in a presumptive grid block." *State v. Baker*, 297 Kan. 482, 485, 301 P.3d 706 (2013). Accordingly, we do not have jurisdiction to review Sanchez' presumptive aggravated sentence.

23

The *Johnson* court exercised jurisdiction over a challenge to the overall statutory sentencing scheme. 286 Kan. at 851-52. It is not entirely clear from Sanchez' brief that he actually makes such a challenge, as his argument shifts between suggesting the statutory scheme violates *Apprendi* and contending the Supreme Court's interpretation of the statute was actually unconstitutional, not the statute itself. As such, there is no clear basis for jurisdiction to review this claim. Regardless, the Supreme Court has squarely foreclosed any argument that the imposition of a presumptive sentence without jury fact finding regarding aggravating factors violates *Apprendi*, and neither Sanchez' brief nor independent research establishes any suggestion that the Supreme Court is moving away from this holding. As such, we are bound by Supreme Court precedent and conclude the district court did not err in this respect. See *State v. Ottinger*, 46 Kan. App. 2d 647, 655, 264 P.3d 1027 (2011) (Court of Appeals observing its duty to follow established Supreme Court precedent in the absence of some indication of a departure by the court from that holding).

Even if we were to conclude that we had jurisdiction to review Sanchez' sentencing challenge, we would not be equipped to do so because Sanchez has failed to include a sentencing hearing transcript in the record. The party claiming an error occurred has the burden of designating a record that affirmatively shows prejudicial error. *State v. Bridges*, 297 Kan. 989, 1001, 306 P.3d 244 (2013). Without such a record, we presume the action of the district court was proper.

Affirmed.