NOT DESIGNATED FOR PUBLICATION

No. 119,837

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

KIM L. KELLEY SR.,
*Appellant.*

MEMORANDUM OPINION

Appeal from Sedgwick District Court; ERIC A. COMMER, judge. Opinion filed September 20, 2019. Affirmed.

*Mark T. Schoenhofer*, of Wichita, for appellant.

*Boyd K. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., PIERRON and ATCHESON, JJ.

PER CURIAM: In 2006, a jury convicted Kim L. Kelley Sr. of two counts of rape, one count of aggravated incest, and one count of attempted rape. The Court of Appeals found the district court erred by admitting hearsay evidence and the error was not harmless. It reversed and remanded for a new trial. *State v. Kelley*, 42 Kan. App. 2d 782, 795, 217 P.3d 56 (2009).

1

In 2011, Kelley pled guilty to aggravated battery. Although the district court sentenced him to probation, he had already served a longer term than his underlying sentence, and his probation was terminated at sentencing.

In 2014, Kelley petitioned for expungement of his conviction. The district court denied the request, finding expungement was inconsistent with the public welfare. Kelley appeals.

FACTS

In 2006, K.R. lived with Kelley—her biological father—and her stepmother. On June 7, 2006, K.R. disclosed to her stepmother that Kelley had been going into her room and touching her. Stepmother discussed the allegations with Kelley and after meeting with their pastor, she insisted Kelley go to the police station.

> "Later that night Kelley went to the police station and informed the officers he needed to report an incident involving his daughter. At Kelley's request, Officers Bradley Harris and Eric Matthews led Kelley to a private interview room. Kelley provided the officers with his name and address and stated he was there to report that he had made sexual advances to his daughter sometime during the month of May or June. Kelley stated he had touched his daughter on her vagina while he was masturbating. When the officers realized Kelley was confessing to a felony offense, they asked the name of his daughter and then terminated the interview. Harris took a picture of Kelley to document a small scratch on the left side of his face and a bite mark on his chest. Kelley's statement to the police was neither recorded nor reduced to writing." 42 Kan. App. 2d at 784.

K.R. reported that Kelley had sexually assaulted her three times and attempted to do so a fourth time. She reported that the first time she resisted Kelley, but he had been able to put his penis in her vagina. On June 6, 2006, when he tried to assault her for the fourth time, he entered her bedroom and got on top of her. When he tried to sexually

penetrate her, her pajama bottoms were torn. After she scratched his face and bit him, he bit her and left the room. On June 9, 2006, the State charged Kelley with three counts of rape and one count of attempted rape.

K.R. testified about the four incidents of sexual assault at the preliminary hearing on June 11, 2006, but alleged the first assault was consensual. The State amended Count 1 to aggravated incest. Later, in a letter to Kelley, K.R. recanted the allegations, and apologized to him for lying. Stepmother then took K.R. to Kelley's defense counsel, where she reported all the incidents with Kelley were consensual. At a later date, stepmother took her to defense counsel's office again and K.R. recanted the allegations against Kelley and stated nothing had happened.

At the jury trial on January 23, 2007, K.R. testified she had lied about the whole story and the first three incidents had never happened. She stated that on June 6, 2006, Kelley tried to wake her up in the morning, but she would not get out of bed. She testified to a physical struggle with Kelley and stated she scratched him and bit him on the abdomen, and he bit her on the shoulder. She claimed she made the false allegations because she had been upset with Kelley for not allowing her to date and taking away her cell phone.

The jury convicted Kelley of all four counts. The district court sentenced him to 267 months' imprisonment with 36 months of postrelease supervision. In his direct appeal, Kelley challenged the district court's decision to allow the detective to testify about the interview with stepmother when the State had not called her as a witness, therefore Kelley could not cross-examine her. The Court of Appeals found the testimony was inadmissible hearsay that could not be deemed harmless. It reversed and remanded the case for a new trial. 42 Kan. App. 2d at 795.

On May 27, 2011, Kelley entered into a plea agreement with the State. He agreed to plead guilty to one count of aggravated battery, a level 7 person felony, and the State agreed to recommend the high grid box number and follow the presumption of probation. Because Kelley had already served 64 months in prison, the parties agreed to acknowledge that as jail credit and request that the district court order that his time served satisfied any sentence imposed rather than imposing the probationary term. In his plea, Kelley acknowledged that he

"intentionally caused 'bodily harm' to K.C.R., the sixteen (16) year old victim in the instant matter, by biting K.C.R. on June 6, 2006 during a physical altercation with the child. [Kelley] acknowledge[d] that his actions that day were committed in a manner whereby great bodily harm can or could have been inflicted on K.C.R."

The district court sentenced Kelley to 24 months of probation with an underlying sentence of 26 months in prison with 12 months of postrelease supervision. The court ordered Kelley's probation to be terminated.

On July 15, 2014, Kelley petitioned for expungement. He asserted he had been convicted of aggravated battery on May 27, 2011, and released from postrelease supervision on June 28, 2011. He contended he had not been arrested or convicted of any felony or misdemeanor since and no charges were pending or being instituted against him, his current circumstances and behavior warranted expungement, and it was consistent with public welfare.

The district court heard the petition on July 12, 2018. The State asserted that in such hearings, attorneys generally proffer their evidence and there was not much to ask a character witness on cross-examination. The State did not object to the court reviewing letters Kelley submitted that were written by witnesses who were unable to testify, and the State offered a written statement by K.R. Kelley did not object and stated it was "tit

4

for tat" and only fair that the State submit a written statement since he also submitted letters. The court received letters from Senior Pastor Herman Hicks of the Greater Pentecostal Church of God in Christ; John E. Dorsett, supervisor of construction projects for the Wichita Public Schools; Carol A. Williams; and DeWayne Henley, a deacon with Kelley at church.

Carla Echols testified she had known Kelley and his family for many years and she "[felt] like he absolutely should be considered for expungement. He has just been stellar in my relationship with him." She testified that her heart sank when she heard about what happened and that she did not feel like it should have gone before a judge. She considered Kelley to be a "stellar human being" who was moving forward and should not have to worry about this coming up again. When the court questioned Echols about her understanding of Kelley's conviction, she stated she knew Kelley would have never been involved in such a situation and considered it "a really unfortunate situation from this young woman."

In a short bench conference, the district court asked counsel whether either party objected to it asking Echols about the paragraph in *Kelley*, 42 Kan. App. 2d at 784, that described Kelley's statements to law enforcement, informing officers that he touched K.R.'s vagina while he masturbated. When asked if he objected, Kelley stated, "No. I think the Court has to consider all evidence."

When the district court asked if Echols had known that Kelley's apparent admission to police began the investigation, she stated she had not heard that. After she stated she had heard the allegations were not true, the court clarified that the statements in the above paragraph came directly from Kelley. Echols concluded her testimony by stating she would need more information about what took place.

Kelley's second character witness was Donald Smith, pastor at Eastside Cathedral of Praise, who had known Kelley for at least 10 years. Smith considered Kelley to be a "very dependable guy." With no prompting, he continued, "I believe in justice, but I also have been involved in situations and circumstances where what has been said or what has been stated to be said has not necessarily been true. I am talking about even from the police department." He noted that he is a "pretty good judge of character" and the allegations against Kelley did not mesh with what he knew of Kelley.

Smith expressed that "everything that is put down on paper as being stated as fact is not always fact, even in the courtroom." When the district court stated there was no dispute as to those statements, Smith stated, "Sometimes people can actually put things down and put words into people's mouth. I don't know anything about that. That is the first time I have heard that, but I have always learned, with a degree of skepticism, to receive things as fact." He echoed Echols' statement in that he wanted to know the circumstances of Kelley's statements. He concluded that from his perspective as pastor, he had not seen Kelley act in a manner similar to the allegations.

Kelley next called Edward Coleman, pastor at Mount Carmel Church of God in Christ, who had known Kelley's family for more than 25 years. Coleman had worked with Kelley and, at stepmother's request, talked with Kelley about God. He testified that when Kelley began attending church, his life changed. Coleman reported his relationship with Kelley and stepmother developed to a point that they both called him "dad." Coleman testified that he trusted Kelley around his children, all of whom were grown. He expressed that Kelley was a changed man and he believed that if he had done anything in his past, he would not do it again. Coleman stated that Kelley had changed his life with God and God had blessed him to have a better future.

Stepmother was Kelley's last character witness. She testified that when K.R. made the allegations, both she and Kelley were mandated reporters as they worked for the

6

school district. She claimed the State did not call her to testify at Kelley's trial because she would not lie and say Kelley confessed because it was K.R. who made those allegations. Stepmother blamed Kelley's defense counsel for messing up at trial. She described K.R. as having a reputation for dishonesty and expressed that she had been oversexualized when she lived with her mother and grandfather. She stated she and Kelley took K.R. out of her mother's house when she was 12 years old because Kelley wanted to be the dad he was called to be, although she believed it was a bad idea. She testified that Kelley never raped K.R. and never told the detectives that he inappropriately touched her. She insisted that when detectives questioned him, he remained silent. She also contended that K.R. switched her story many times, even waking her up at times to tell a different story about what had happened.

On the contrary, at the hearing on Kelley's motion to assert the marital privilege, which the district court denied, the State presented that K.R. was a year ahead of schedule at school and was getting ready to begin her senior year. K.R. had been an A/B student and planned on finishing high school a year early and starting school at Butler Community College. After the investigation began and Kelley had been arrested, K.R. remained in the home with stepmother and threatened to run away if she was removed from the home because she wanted to graduate early and move on with her life goals.

The district court redirected stepmother's testimony, stating the hearing was not to look back. The court acknowledged that the record showed K.R. had given different stories. The court expressed, "We are here for an expungement hearing for Mr. Kelley. That is what I am really expecting you to address." Stepmother testified that Kelley was a wonderful man who took care of his children. She stated that Kelley worked on cars when he could and hoped to obtain employment with John Dorsett, who installed playground equipment for the school district. But he could not with a felony conviction on his record.

7

Stepmother testified: "[Kelley] is a wonderful man, and I hate that trying to help someone put us in this predicament, in this situation." She and Kelley had a 25-year-old nephew who lived with them sometimes and a 28-year-old son over whom they had guardianship. They also regularly cared for their son's four-year-old twins and helped take care of her deceased sister's grandchildren.

Kelley then proffered that he went to the police station because he only had 24 hours to make a report or he would lose his job. He provided information about what K.R alleged, and he denied making that statement to the police. He concluded that his crime of conviction was not a sex offense, only aggravated battery. Kelley explained that the purpose of the expungement was so that he could obtain employment that required work at McConnell Air Force Base and other bases. With a felony conviction, he could not enter the facilities. He claimed that expungement allowed him to move forward from "this horrible experience" that he had to suffer. Kelley contended that if the district court reviewed K.R.'s statement, she expressed the need for consequences and that from 2006, when the alleged incidents occurred, to 2018, he had served more than the time for his crime of conviction and had carried the scourge of the conviction for 12 years. Kelley argued he met the three statutory requirements for expungement.

In explaining that its objection to expungement was based largely on K.R.'s wishes, the State referenced K.R.'s input statement. K.R. had marked that she did not feel Kelley should be granted expungement and wrote:

> "I feel like every action has a consequence. This happened to me when I was 16 years old. Trying to stop him from having sex with me. I don't think he should be able to get this expunged. I have to live with what happened [daily]. And with this on his [record], maybe he'll remember this [daily]."

8

The State argued:

"When you consider the type of crime, the allegations in this case being what they were, that this victim suffered at the hands of her father, being inappropriately touched, I can't imagine how that affected her. You can tell from her statement that she made that this is something that she lives with."

The State addressed the fact that law enforcement reported what Kelley said to them and there was no reason to doubt the officers. It pointed to *Kelley* and noted the Court of Appeals reversed the conviction based only on stepmother's statements to law enforcement. It concluded that facts from the trial were concerning and K.R. continued to live with the effects daily. The State asked the district court to deny Kelley's petition under the third statutory prong, as expungement was inconsistent with public welfare.

The district court noted that Kelley was not subject to the Kansas Offender Registration Act and stated "[I]t sounds like they have young children in their home, which is probably where the Court would have the most concern for the future, and I mean by that, with children or persons under the age of 18." The court considered the fact that the purpose for expungement was for employment building playground equipment which would not be a similar circumstance to K.R.'s allegations. It questioned how denying expungement would serve the interest of public safety if Kelley continued to have young children in his home.

The State suggested that because K.R. lived with the scar and could not get rid of the trauma, Kelley should not be able to get rid of the stigma of being a felon. Kelley argued the State failed to show how expungement was inconsistent with public welfare and its only point seemed to be that K.R. was still affected by the incident. He pointed out that he was seeking expungement for the sake of employment and his conviction prevented him from working at the Air Force Base. The district court focused on the

9

employment possibilities upon expungement, as Kelley would have no restrictions in his job search and could obtain employment in other school districts. The court expressed the lack of employment limitations presented a public safety concern.

The district court found Kelley met the first and second prongs of K.S.A. 2005 Supp. 21-4619(e), in that he had not been convicted of a felony in the two years preceding the expungement proceeding and no such crime was pending or being instituted at the time, and, based on the character witnesses, Kelley's circumstances and behavior warranted expungement. But the court struggled with the third factor. It noted it had to view the prong from circumstances of the public. It viewed the offense in light of the 2011 plea, and found the aggravated battery was premised on a bite mark that occurred when Kelley was in K.R.'s bed early in the morning. Law enforcement had noticed Kelley's scratch during his interview and K.R. testified to having scratched him. The court found those circumstances and facts made the most sense in light of Kelley's statements to police in 2006. The court expressed: "[B]ecause of that, I do have a concern for public welfare in the future with regard to employment that Mr. Kelley could be in that would place him around children." The court recognized that denial of the petition did not prevent the circumstances from happening again, but it was not ready to say that expungement was consistent with the public welfare. The court denied the petition.

Kelley appeals.

ANALYSIS

The parties agree caselaw dictates that K.S.A. 2005 Supp. 21-4619 governs the petition as that was the statute in place at the time of the commission of the offense. *State v. Jaben*, 294 Kan. 607, 613, 277 P.3d 417 (2012). Under K.S.A. 2005 Supp. 21-4619(e):

10

"At the hearing on the petition, the court shall order the petitioner's arrest record, conviction or diversion expunged if the court finds that:

(1) The petitioner has not been convicted of a felony in the past two years and no proceeding involving any such crime is presently pending or being instituted against the petitioner;

(2) the circumstances and behavior of the petitioner warrant the expungement; and

(3) the expungement is consistent with the public welfare."

The parties also agree with the district court's findings that Kelley satisfied the first two requirements. Kelley only challenges the court's findings that expungement was inconsistent with the public welfare.

Kelley contends the district court abused its discretion when it denied his petition for expungement as the State did not present any evidence to counter his assertions that he satisfied the three prongs under K.S.A. 2005 Supp. 21-4619(e) and the court based its denial on the allegation of sexual abuse although Kelley's crime of conviction was not sexual.

When reviewing a district court's decision on a petition for expungement, the appellate court reviews the decision using the abuse of discretion standard. *State v. Sandstrom*, 273 Kan. 558, 561, 44 P.3d 434 (2002). Judicial action constitutes an abuse of discretion if it is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011).

*Abuse of Discretion Based on an Error of Law*

Kelley contends the district court abused its discretion by considering the sexual nature of his overturned 2006 conviction rather than restricting its review to the facts of the 2011 plea. It seems he is claiming the court abused its discretion by basing its

11

determination on an error of law as he refers to K.S.A. 2005 Supp. 21-4619(d)(6) as a restriction on what the district court may consider in making its determination. K.S.A. 2005 Supp. 21-4619(d) provides:

"When a petition for expungement is filed, the court shall set a date for a hearing of such petition and shall cause notice of such hearing to be given to the prosecuting attorney and the arresting law enforcement agency. The petition shall state:

. . . .

(6) the identity of the convicting court, arresting law enforcement authority or diverting authority. There shall be no docket fee for filing a petition pursuant to this section. All petitions for expungement shall be docketed in the original criminal action. *Any person who may have relevant information about the petitioner may testify at the hearing. The court may inquire into the background of the petitioner and shall have access to any reports or records relating to the petitioner that are on file with the secretary of corrections or the Kansas parole board.*" (Emphasis added.)

Kelley focuses on the last two sentences of the statutory subsection, italicized above, in arguing that the State presented no witnesses and the court improperly looked beyond the 2011 plea agreement. However, in *State v. Cummins*, No. 104,138, 2011 WL 1196947, at *3 (Kan. App. 2011) (unpublished opinion), the Court of Appeals found that when "considering whether an expungement is consistent with the public welfare, a court can consider the nature of the underlying offense and not just the defendant's exemplary behavior following the conviction." (Citing *Sandstrom*, 273 Kan. at 564). In *Cummins*, the defendant was caught in a Target store with his pants down, using a mirror to watch a girl trying on clothes in a changing room. The State charged him with misdemeanor eavesdropping, not a sex offense. Because of the sexual nature of the offense, the district court denied Cummins' petitions for expungement in 2008 and 2010. For both petitions, the district court found expungement was inconsistent with public welfare. The Court of Appeals affirmed the district court's finding that because of the sexual nature of

12

Cummins' eavesdropping offense, which did not require sex offender registration, the conviction needed to be preserved. 2011 WL 1196947, at *3.

Here, Kelley's petition for expungement was filed under the 2006 underlying criminal case number. So, though Kelley's initial convictions for aggravated incest, rape, and attempted rape were reversed, and he was ultimately convicted of aggravated battery, the facts were available to the court as the expungement is filed under the same case number per K.S.A. 2005 Supp. 21-4619(d)(6), and the facts used by the district court were from the published Court of Appeals opinion. Additionally, expungement hearings do not abide by the same rules of evidence as used in trials in that the parties often proffer their evidence rather than conduct a formal evidentiary hearing.

While this case presents a factual scenario unlike others reviewed by this court, because of the reversal and plea to a much lesser crime, Kelley has provided no authority to assert that the district court lacked authority to review the case file. It seems K.S.A. 2005 Supp. 21-4619(d)(6) does not limit the court's review to the department of corrections records and reports but expands the district court's ability to review such reports in addition to all information included under the case number. Because the court is charged with determining what is in the public's interest, not just the interest of the petitioner, the statute more likely expands the court's review to documentation as to the petitioner's most recent behaviors rather than restricting review to only the more recent behaviors. This is reflected in *Sandstrom*, 273 Kan. at 563-64, and *Cummins*, 2011 WL 1196947, at *3, in which the Kansas appellate courts recognized that it is in the public's interest for some offenses to remain on petitioners' records despite exemplary behavior following conviction because of the nature of the offenses.

Though the aggravated battery as charged in 2011 was not of a sexual nature, the initiation of the investigation did not change from 2006 to 2011. The Court of Appeals reversed and remanded for a new trial based on the district court improperly allowing law

13

enforcement to testify about stepmother's interview though the State did not call her as a witness and so Kelley could not cross-examine her. However, the police investigation into K.R.'s allegations began due to Kelley's statements to officers, which were not at issue on appeal.

Significantly, in making its determination, the district court only considered the statements that initiated the investigation, not K.R.'s allegations of rape. And before using Kelley's statements in court, the district court called both parties to the bench and asked if either party objected to the court asking Echols whether she was aware of Kelley's statements to law enforcement as contained in the Court of Appeals opinion. Kelley replied, "No. I think the Court has to consider all evidence" and the State replied, "To be fair, Judge, it was going to be part of my argument." After asking Echols if she was aware that Kelley had made the statements, the court stated, "In essence, it is the Court's impression — from what I have read from the Court of Appeals' decision, which is the only record I have — that that was kind of the initiating investigatory event." Given the lax evidentiary standard and the court's consideration of only the statements that initiated the investigation in light of the facts of the 2011 plea, the court did not abuse its discretion in reviewing the Court of Appeals opinion or considering the nature of the offense.

*Invited Error*

Although Kelley argues the State did not present evidence, the parties agreed that the attorneys could proffer the evidence. The State did not object to the district court reviewing letters written by character witnesses who were unable to testify, and Kelley did not object to the court accepting K.R.'s input form and the State's proffer of evidence. Kelley stated it was "[t]it for tat. I'm giving [the court] some letters; she will give [the court] some letters. It is only fair." The State did not call any witnesses, but instead it proffered its evidence in its final arguments. The State noted that it challenged the

14

petition for expungement in large part because of the wishes of the victim. And, just as the district court had, the State focused on Kelley's statements to law enforcement rather than K.R.'s allegations of rape.

Even if the district court improperly considered the sexual nature of the allegations, Kelley invited such error when he failed to object to the court questioning Echols about his statements to law enforcement. Rather than objecting, Kelley stated, "I think the Court has to consider all evidence." Further, he agreed to the State's proffer of evidence and failed to object when the State addressed his statements to law enforcement. A litigant may not invite error and then complain of the error on appeal. *State v. Verser*, 299 Kan. 776, 784, 326 P.3d 1046 (2014).

*Abuse of Discretion for Unreasonableness*

Because the underlying case revolved around allegations of sexual contact with Kelley's daughter, who lived in his home, the district court questioned whether denying the expungement served the interests of public safety when Kelley continued to regularly have child relatives in his home. The State replied that K.R. believed she lived with a scar from Kelley's actions and so he should live with the felony record for the rest of his life. The State added that expungement was legislatively created to permit those who had absolutely changed their lives to receive some benefit and recognized that felony convictions affect different areas of life. The State concluded that here, Kelley's record should remain because employers, loan officers, and others who consider criminal history should know of his conviction.

The district court focused on the State's assertion that employers should know of Kelley's conviction. It pointed out that expungement would permit him to work in school districts again, which presented a concern for public safety. The court denied the petition based on its concern for public welfare regarding Kelley's potential employment that

would place him around children. This determination was not unreasonable, fanciful, or arbitrary. See *Sandstrom*, 273 Kan. at 564 (Supreme Court affirmed the district court's expungement denial, finding it was in the public's interest to maintain the petitioner's murder conviction record); *Cummins*, 2011 WL 1196947, at *3 (Court of Appeals affirmed district court expungement denial, finding it was in the public's interest to keep the conviction on record because of the sexual nature of the offense). The district court did not abuse its discretion by denying Kelley's petition for expungement.

Affirmed.